NORTHWESTERN INDUSTRIAL
PIPING, INC.

v.

The UNITED STATES.

No. 541-71.

United States Court of Claims.

Oct. 13, 1972.

Donald F. Krank, Lancaster, Pa., attorney of record for plaintiff.

Thomas E. Thomason, Washington, D. C., with whom was Acting Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This case involves an appeal by plaintiff, Northwestern Industrial Piping, Inc. (formerly Northwestern Heating and Plumbing Company), from a decision of the Armed Services Board of Contract Appeals (ASBCA), (ASBCA No. 12676, 70–2, BCA ¶ 8552). Review is sought under the familiar standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970). Plaintiff contracted with the Navy to provide a steam and condensate distribution system at the United States Naval Training Center, Great Lakes, Illinois. A controversy arose as to whether the contract required that above-ground pipe fittings be covered with aluminum jackets. It is plaintiff's position that the contract required jackets only on straight lengths of pipe and not on fittings and that jacketing the fittings constituted a change which required extra compensation in the amount of $16,914 plus interest. Both the contracting officer and the ASBCA found that jacketing the fittings with aluminum was a requirement of the contract specifications and that plaintiff was thus not entitled to extra compensation. The case is presently before this court on cross motions for summary judgment. We believe that the ASBCA decision is correct and should be upheld for the reasons hereinafter stated.

On January 22, 1965, plaintiff was awarded Contract No. NBy–56358 in the amount of $2,488,577, by the Department of the Navy for the construction of a steam and condensate distribution system connecting a main boiler plant with six existing steam plants servicing recruit barracks, hospital, administrative, and training facilities at the United States Naval Training Center, Great Lakes, Illinois. The system ran above and below ground through manholes and over large concrete piers or structural steel frames and involved between 75,000 and 90,000 linear feet of piping.

On January 15, 1965, after receiving notice that it would be awarded the contract, plaintiff executed a subcontract with AC and S, Inc. (then Armstrong Contracting and Supply Corporation) in the amount of $335,000 for furnishing and applying the insulation required by the contract. On June 8, 1965, representatives of AC and S and plaintiff met with Mr. Sobolewski, a Navy engineer in charge of inspecting the project, to discuss the materials and methods to be used in insulating the system prior to AC and S's making a formal written

submittal. What transpired at this meeting is disputed by the parties. The representatives of AC and S and plaintiff testified in the administrative proceeding before the Board that at this meeting Sobolewski was advised that the specifications were silent concerning waterproofing of the insulation on above-ground fittings, that good trade practice required waterproofing and that AC and S would use asphalt mastic for this purpose. They further testified that Sobolewski was concerned that the fittings would then be black and contrast with the piping being covered with aluminum so they agreed to give the mastic two coats of aluminum paint so that the finish would appear uniform. Sobolewski's testimony relative to the meeting indicated that he had agreed to the use of asphalt mastic, rather than roof felt, since it would produce a more watertight fitting, but he did not recall any discussion concerning the use of aluminum paint on the fittings. Moreover, he informed them that any agreement reached at this meeting would have to be confirmed in writing by the officer in charge of construction. Thus, while precisely what was said and agreed upon at this meeting is open to question, both sides apparently agree that the aluminum jacketing of above-ground fittings was not explicitly discussed.

Following the June 8, 1965, meeting AC and S forwarded to the Navy, through plaintiff, a written submission in the form of a letter dated June 15, 1965, and attached submittal data sheets. This written submission indicated that outdoor fittings would be covered with asphalt mastic, but did not indicate that this mastic would be further covered with aluminum jackets or aluminum paint. The submission was approved by the Navy and returned on July 2, 1965, by a letter which stated that "[t]he status of APPROVAL on the above listed items is as noted, subject to the requirements of the referenced contract * * *." A few months after receiving written approval, AC and S began performance.

In June 1966, the Navy's field inspector advised AC and S that the contract specifications called for installation of aluminum jackets on above-ground pipe fittings. AC and S notified plaintiff of the problem by letter, denying the existence of any contract requirement to provide aluminum jackets for the fittings, and advising that if the fittings were to be jacketed with aluminum, this must be construed as a change necessitating additional compensation. Sobolewski advised plaintiff that the Navy considered aluminum jacketing for the fittings to be a contract requirement and suggested that plaintiff file a claim in accordance with the disputes procedure. AC and S sought to rely on its understanding of the agreement reached at the meeting in June 1965, and advised that it would proceed to paint the fittings with aluminum paint. Then, the Commanding Officer, Midwest Division, Naval Facilities Engineering Command, by letter to plaintiff dated November 22, 1966, directed the installation of aluminum jackets on exterior pipe fittings. Following receipt of this directive, AC and S installed aluminum jackets on all exterior fittings.

Plaintiff's claim for additional compensation was denied by the contracting officer on July 6, 1967. The ASBCA denied plaintiff's appeal on October 29, 1970, upon determining that the aluminum jacketing of the above-ground fittings was a requirement of the contract specifications.

## I. Scope or Review

■■ In any Wunderlich Act review the threshold consideration must be the scope of the court's review. The Wunderlich Act makes Board decisions on questions of fact arising under the contract "final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." (41 U.

S.C. § 321.) On the other hand, Board decisions on question of law are not entitled to finality (41 U.S.C. § 322); no presumption of correctness attaches to them and they are not binding on the court. Gorn Corp. v. United States, 424 F.2d 588, 191 Ct.Cl. 560 (1970); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967).

▮▮▮ The dispute in the instant case essentially boils down to a problem of contract specification interpretation. Defendant's position is that the contract required exterior fittings to be covered with aluminum jackets, while plaintiff takes the stance that the contract was silent on the matter or was at least ambiguous. The Board's decision herein is not binding on the court because the interpretation of contract specifications is a question of law. Corbetta Constr. Co. v. United States, 461 F.2d 1330, 198 Ct. Cl. — (1972); Jamsar, Inc., v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971); Martin Lane Co. v. United States, 432 F.2d 1013, 193 Ct.Cl. 203 (1970). Nevertheless, while the outcome in many Wunderlich Act cases is determined by the scope of the court's review, that question is really academic in this case. We believe that the contract specifications are clear and unambiguous in requiring above-ground fittings to be jacketed with aluminum and that the Board's interpretation was, therefore, correct whether entitled to finality or not.

*II. Contract Specifications Required That Fittings be Jacketed With Aluminum*

The general provisions of Specification No. 56358/64, the contract specifications herein involved, begin by providing:

1A.2 General Description. The work will include the construction of a steam and condensate distribution system, approximately 15,000 feet in length, connecting seven existing boiler plants * * *. The above ground piping will be supported on concrete piers or structural steel frames and will be insulated and covered with an aluminum jacket. The underground piping will be insulated and completely enclosed in a waterproof conduit * * *.

Section 9 of the contract specifications deals with insulation of the piping system including the waterproofing and jacketing to go over the insulation, and states in pertinent part:

9.1 GENERAL REQUIREMENTS. The work includes furnishing and installing in a workmanlike manner all insulation for the piping systems appurtenances, tanks and equipment as specified herein.

9.3 INSULATION. All above ground and underground pipe, flanges, valves, and fittings shall be insulated, except condensate return piping in the same underground conduit with a steam line * * *.

9.4.2 WATERPROOF COVERING for pipe insulation shall be provided for exterior insulated piping systems. It shall consist of a waterproof protective covering of two layers of impregnated roofing felt conforming to specfication HH–F–185 and asphalt. The first layer shall be secured with a coating of asphalt conforming to specification SS–A–701 and the second layer shall be secured in place with extra heavily zinc-coated steel wires. After wiring the entire surface shall be coated thoroughly with asphalt. The waterproof covering shall be covered with an aluminum jacket. Aluminum jackets shall be not less than 0.017 inch thick and shall be secured with aluminum or stainless steel bands. Under no conditions shall the jacketing be allowed to become electrically coupled to the piping or installed water tight.

9.6.5 WATERPROOF COVERING. All exterior insulated piping exposed to the weather and in tunnels or concrete trenches shall be provided with a waterproof protective covering of two layers of impregnated roofing felt and asphalt as specified under 9.-4.2 * * *.

Defendant argues that the above-quoted contract specifications, when read together, clearly require that exterior fittings be encased in aluminum jackets. "All above ground * * * pipe, flanges, valves, and fittings shall be insulated * * *" (Spec. 9.3), "[a]ll exterior insulated piping exposed to the weather * * * shall be provided with a waterproof protective covering * * *" (Spec. 9.6.5), and "[t]he waterproof covering shall be covered with an aluminum jacket" (Spec. 9.42).

Plaintiff contends that the specifications build an atmosphere of treating "piping" and "fittings" separately, and the former term, as used in the specifications, never embodies the latter term. Plaintiff supports this contention by citing, among others, paragraph 9.1 of the specification which indicates that piping and fittings are two different and distinct parts of the piping system. Although the jacketing of fittings in manholes is not at issue here, plaintiff relies heavily on paragraph 8.19 as an instance where piping and fittings are dealt with separately. This paragraph specifies in part:

8.19 Piping and Equipment in Manholes * * * The piping shall be covered with insulation as specified and shall be provided with a protective covering of one layer of impregnated roof felt, and an aluminum jacket * * *. Special fitting jackets * * * may be used for fittings, valves, and flanges * * *. An equivalent aluminum jacketing system will be acceptable * * *.

Thus, urges the plaintiff, the requirement for a waterproof covering on all exterior insulated piping did not necessitate waterproofing exterior insulated fittings. Plaintiff also places great weight on the fact that paragraph 9.4.2 refers to a waterproof covering for "pipe insulation" but is silent on a waterproof covering for fitting insulation. Since only that which must be waterproofed receives an aluminum jacket, plaintiff follows through by concluding that these fittings are not required to be jacketed.

■ The first question of interpretation with which we are faced is whether the word "piping," as used in the specifications, and, in particular, in paragraph 9.6.5, includes "fittings." It is a well-settled principle that the provisions of a contract must be read as a whole. Martin Lane Co. v. United States, *supra*; Embassy Moving & Storage Co. v. United States, 424 F.2d 602, 191 Ct.Cl. 537 (1970). In the instant case, the meaning of each specification becomes clear and unambiguous when read in conjunction with all of the other contract provisions. When this is done it becomes apparent that "piping" sometimes incorporates "fittings" and sometimes it does not. For example, in paragraph 9.1 of the specification, cited by plaintiff and quoted in relevant part above, the "piping system" is described as including "piping, valves, fittings, appurtenances, tanks and equipment." The term "piping," as used here, clearly means lengths of pipe and would not include "fittings" since they are each separate components of a "piping system." But, paragraph 1A.2 set forth in part above, states that "[t]he above ground piping will be supported on concrete piers or structural steel frames and will be insulated and covered with an aluminum jacket." "Piping" in this specification obviously includes "fittings" since otherwise only straight lengths of pipe would be required to be supported, but not the fittings connecting the straight lengths. The manifest intent is that the entire piping system, including fittings, is to be supported, insulated, and covered with an aluminum jacket. The same specification declares that "[t]he underground piping will be insulated and completely enclosed in a waterproof conduit." It is difficult to imagine how the straight lengths of pipe are to be in a conduit while the fittings remain outside. Paragraph 9.3 specifies that "[a]ll above ground and underground pipe, flanges, valves, and fittings

shall be insulated, except condensate return piping in the same underground conduit with a steam line." It would be unreasonable to construe this to mean that only the straight lengths of pipe in a condensate return piping system in an underground conduit with a steam line are not to be insulated. Naturally, the reason which obviates the need for insulation on straight pipe, the fact that it is in the same conduit with a steam line, likewise obviates the need for insulating the flanges, valves, and fittings. This is yet another instance where "piping" includes "fittings."

Furthermore, plaintiff's reliance on the above-quoted language of paragraph 8.19, in an attempt to establish the proposition that "fittings" are not encompassed by the term "piping," is misplaced. The word piping is there used to include the whole piping system, including fittings. Logically interpreted, it provides that the entire piping system running in manholes shall be insulated, waterproofed, and covered with an aluminum jacket, but special fitting jackets *may be used* for fittings, valves, and flanges, *in place of those generally specified for the piping system.*

We now move on to interpret a paragraph which *bears directly on the resolution of this controversy.* Paragraph 9.6.5 states that "[a]ll exterior insulated piping exposed to the weather and in tunnels or concrete trenches shall be provided with a waterproof protective covering * * *." Here the term piping clearly includes fittings. The entire exterior insulated piping system is required to have a waterproof covering, for, otherwise, you are faced with the absurdity of only covering straight lengths of pipe while leaving the fittings exposed to the elements.

The remaining provision which must be construed is paragraph 9.4.2, previously set out in its entirety, and, in

particular, the words "pipe insulation" contained in the first sentence. Plaintiff has argued that "pipe insulation" is used only on straight pipe and not on fittings. However, as defendant quite aptly points out in its brief, "pipe insulation" is a generic term and not restricted to use on a pipe any more than the "roofing felt," required by the same specification, is restricted to use on a roof.

While there was credible testimony before the Board on both sides of the question of whether the contract specifications required above-ground fittings to be jacketed with aluminum, other evidence was offered which strongly supported the government's position. There was a letter from the engineering consulting firm which drafted the specifications stating their opinion that "the specifications define the requirements for providing aluminum jackets on all exterior fittings." Furthermore, in Section 4 of the "Code for Pressure Piping" published by the American Society of Mechanical Engineers, introduced as evidence in the Board proceeding, the terms "piping" and "piping system" are used interchangeably and "piping" is described as including "fittings." [1]

Of considerable importance in deciding on the proper interpretation of the specifications is the fact that the plaintiff's interpretation produces an unreasonable result. This piping system, much of which was above ground, ran through both densely populated recruit training areas and remote woodlands. It was therefore subject to human abuse and to the elements. The system connected recruit barracks, hospital, administrative, and training facilities. Many of these buildings had recently been constructed and had life expectancies in the range of 40 to 50 years. It is therefore absurd to conclude that only the straight lengths of pipe were to be protected

---

1. Section 4 of the "Code for Pressure Piping" provides in pertinent part: 401. Scope. (a) This section covers the design, manufacture, test, and installation of district heating and central heating piping systems and the component parts of such piping including, for example, the pipe, flanges, bolting, gaskets, valves, and fittings * * *.

**1314**

with aluminum jackets while the fittings were to be covered only by asphalt mastic. Mastic does not have the strength or the durability of aluminum and thus offers far less in the way of protection. While the aluminum jackets might well last for the lifetime of the building the steam distribution system was designed to serve, mastic, in the adverse weather conditions of that area, would probably not endure for 20 years. In view of the considerable expense involved in providing aluminum jacketing, it is inconceivable that large gaps would be left at the location of each fitting. Such a weak link in an otherwise strong and well protected system, would be a never-ending maintenance expense.

We find that the contract specifications were clear and unambiguous in requiring that the exposed exterior piping system, including fittings, be insulated, that the insulation be waterproofed, and that the waterproof covering be encased in aluminum jacketing.

### III. Trade Practice

There was considerable testimony at the hearing before the Board on whether or not trade practice in the insulation industry called for the aluminum jacketing of fittings. Plaintiff's witnesses testified that it was not trade practice, while defendant's witnesses testified that it was, or at least that it was not contrary to trade practice. However, since we have decided that the contract specifications were clear and unambiguous, and since trade practice cannot override unambiguous, contract provisions (S.S. Silberblatt, Inc. v. United States, 433 F.2d 1314, 1323, 193 Ct.Cl. 269, 288 (1970)), we do not have to consider the question of what was required by trade practice in the industry.

### IV. Effect of June 1965 Meeting

As previously mentioned, what took place at the June 1965, meeting between representatives of AC and S and plaintiff, and Mr. Sobolewski, a Navy inspector, is subject to grave doubt. Three things, however, are apparently not in controversy. First, it was agreed that asphalt mastic would be used to waterproof the exterior fittings rather than roofing felt. Second, and of considerably more importance, nothing was specifically said about the requirement for covering these fittings with aluminum jackets. Third, and also extremely important, the written submission which was sent by AC and S to the Navy, and approved by the Navy, made no mention of either painting the mastic on exterior fittings with aluminum paint or covering these fittings with aluminum jackets. With regard to these fittings, it merely stated that they would be waterproofed with mastic. Any other changes in the contract specifications agreed upon at the meeting would have had to have been submitted in the same manner for approval in writing by the officer in charge of construction. Since this was not done, plaintiff is bound by the unambiguous language of the specifications.

### V. Conclusion

The Court has determined that the contract considered as a whole was clear and unambiguous in specifying that exterior insulated fittings be covered with waterproofing and encased in aluminum jackets. Since there is no other basis upon which plaintiff can prevail, we must find for the defendant.

Accordingly, defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's petition is dismissed.