**PACIFICORP CAPITAL, INC. and Datapoint Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 452–87C.**

United States Claims Court.

April 5, 1992.

See also 15 Cl.Ct. 663.

Michael E. Geltner, Washington, D.C., for plaintiffs.

Richard E. Rice, Dept. of Justice, Washington, D.C., with whom were Asst. Atty. Gen., Stuart M. Gerson, and Asst. Director, Thomas W. Petersen, for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

This case is before the court on the plaintiffs' motion, and the defendant's cross-motion for summary judgment. Plaintiffs, Datapoint Corporation (Datapoint) and Pacificorp Capital, Inc. (Pacificorp), brought this action under the Contract Disputes Act of 1978, 41 U.S.C. §§ 605(a)–605(c) (1988). The jurisdiction of this court is uncontested under 28 U.S.C. § 1491 (1988), as to plaintiff Datapoint.[1]

---

1. Datapoint is the party which contracted with the government and, therefore, is clearly entitled to bring suit. With regards to Pacificorp, as near as the court can surmise from the papers filed, the only relationship it has to this litigation is, that as a financing group, Pacificorp paid Datapoint a sum of money in return for receiving the government agencies' monthly lease payments under the six contracts.

Despite the overthrow of the common law prohibition against assignment, the rule that contract rights are freely assignable is not without exception. Federal statutes forbid the assignment of claims against the United States, before the issuance of a warrant for payment, and the assignment of any public contract or order. See 41 U.S.C. § 15 (1988). An exception is made to allow a government contractor to

This is an action for breach of contract based on a General Services Administration (GSA) schedule contract for procurement of automatic data processing equipment (ADPE or Datapoint equipment). In the Complaint filed with this court, plaintiffs seek $160,449.67, plus interest, costs and attorney's fees, as the sum of the unpaid lease payments claimed due to them under six delivery orders issued in accordance with the contract. The delivery orders were executed by the United States Department of the Air Force, Department of the Army and Department of the Navy, pursuant to the terms and conditions of the fiscal year 1986 General Services Administration schedule contract (FY '86 GSA schedule contract) with Datapoint.[2] The Datapoint equipment contracted for was to be used by several branches of the military and distributed through the services' contracting supply centers to: Scott Air Force Base, Illinois (Claim No. 1); United States Army Garrison, Fort Ritchie, Maryland (Claim No. 2); Navy Supply Center, San Diego, California (Claim No. 3); Navy Supply Center, Norfolk, Virginia (Claim No. 4); Marine Corps Air Station, Cherry Point, North Carolina (Claim No. 5); and Randolph Air Force Base, Texas (Claim No. 6).

After careful consideration of the briefs filed by the parties, the oral argument held on the cross-motions for summary judgment, consideration of the numerous supplemental materials filed by the parties, and for the reasons discussed below, the plaintiffs' Motion for Summary Judgment is, hereby, DENIED, and the defendant's Cross–Motion for Summary Judgment is GRANTED.

## FACTS

Plaintiff, Datapoint, is a manufacturer and vendor of automatic data processing equipment, which specializes in leasing these systems to government agencies. Prior to the start of FY '86, Datapoint entered into negotiations with the General Services Administration (GSA) to continue their schedule contract whereby other agencies of the government were able to acquire data processing equipment from Datapoint in accordance with the process, terms and conditions set forth in the schedule contract. Negotiations between GSA and Datapoint over the terms and conditions of Datapoint's FY '86 GSA schedule contract resulted in two significant changes from prior GSA/Datapoint contracts.

First, under the terms and conditions of the FY '86 GSA schedule contract with Datapoint, government agencies were no longer able to enter "basic monthly rental" agreements for automatic data processing equipment. Agencies wishing to commission Datapoint equipment could either purchase the equipment outright or enter into the Federal Lease to Ownership Plan (FLTOP) contract developed in the provisions of the FY '86 GSA schedule contract.

make, subject to some limitations, a single assignment to a financial institution. However, in plaintiffs' Second Amended Complaint, plaintiffs state:

Datapoint assigned its interests in the ADPE [Automatic Data Processing Equipment] and its right to receive lease payments with respect to the contracts covered by the first through third claims and the fifth through eighth claims to GSAI in return for payment of a principal sum. GSAI is a financing institution within the meaning of the federal assignment of claims statutes. Pursuant to a general authorization from GSA, however, GSAI did not perfect its assignment under the federal assignment of claims statutes, and it asserts no direct rights against the United States, but, instead, is a party-plaintiff in accordance with Rule 17, F.R.Civ.P., because it is the real party in interest as to the first three claims.

In its papers, the plaintiff does not indicate on what basis Pacificorp claims it is properly joined in regards to the remaining three claims: The Naval Supply Center, Norfolk, Virginia; Marine Corps Air Station, Cherry Point, North Carolina; and Randolph Air Force Base, Texas.

In the Claims Court, the real party in interest requirement is found in Rule 17(a) of the Rules of the United States Claims Court (RUSCC), which contains the same provisions found in Rule 17(a) Fed.R.Civ.P. However, because no award will be made by the court to the plaintiffs, this court does not need to join the debate over the definition of "real party in interest."

2. A delivery order against the base GSA schedule contract was considered a contract in itself encompassing all of the terms and conditions of the base contract.

The FY '86 GSA schedule contract with Datapoint begins:

TERMS AND CONDITIONS APPLICABLE TO RENTAL OF GENERAL PURPOSE AUTOMATIC DATA PROCESSING EQUIPMENT AND PUNCHED CARD EQUIPMENT

NOTICE—NOTWITHSTANDING THE TERMS AND CONDITIONS CONTAINED HEREIN, BASIC MONTHLY RENTAL IS NOT AVAILABLE UNDER THIS SPECIAL ITEM. AGENCIES DESIRING TO RENT MACHINES MUST ISSUE ORDERS UNDER AND BE SUBJECT TO THE PROVISIONS OF THE FEDERAL LEASE TO OWNERSHIP PLAN (FLTOP).

Agencies may issue renewal orders for previously installed rented equipment under the prices, terms and conditions of the Federal Lease to Ownership Plan (FLTOP) set forth in Special Item 132–1 or effect a purchase of the machine under the purchase of installed provisions set forth in Special Item 132–1. The actual purchase conversion price is determined by the date the notice to exercise the option to purchase or convert to FLTOP is received by Datapoint. Funded orders to effect purchase under the FLTOP, will be accepted provided they are received by Datapoint on or before January 2, 1986. Should the Government decide, on or before January 2, 1986 to return the equipment to Datapoint, the Government shall issue a delivery order for the appropriate rental and maintenance charges to cover the period from October 1, 1985 up to and including the rental termination date not later than January 2, 1986.

For those machines which on September 30, 1985, were rented under the Monthly Rental provisions contained in Special Item 132–1 of Contract No. GS00K8501S5907 [FY '85 GSA schedule contract with Datapoint], agencies may, through January 2, 1986, elect to exercise the purchase option provisions of this contract in lieu of placing the machine under the Federal Lease to Ownership Plan (FLTOP). * * * [P]rovided that order exercising the purchase option is received by Datapoint no later than January 2, 1986. After this date, the purchase option provisions shall no longer be available, * * * and the equipment will automatically convert to a FLTOP.

The second significant change from the FY '85 agreement was in the terms of the FY '86 FLTOP contract itself, specifically, the Intent Clause of that contract. The FY '86 FLTOP Intent Clause reads:[3]

1. STATEMENT OF INTENT
a. INTENT
(1) It is understood by all parties to this contract that this is an arrangement, that it is a lease to ownership contract. In that regard, the Government as lessee, contemplates fulfilling that agreement.

Other terms of the Datapoint FY '86 base FLTOP contract pertinent to the instant suit are:

2. GENERAL
a. PERIOD OF LEASE
(1) The "Initial Term" of the DATAPOINT FLTOP or the DATAPOINT FLTOP C is from the commencement date to the following September 30. Suc-

---

**3.** Prior GSA/Datapoint contracts are not at issue in this case; however, the FY '85 GSA schedule contract with Datapoint is important because each of the contracting activities involved in this suit previously acquired the Datapoint equipment in question under the rental provisions of the FY '85 schedule contract. Therefore, the language of the Intent Clause of the FY '85 FLTOP contract is relevant to understand the significance of the change to the Intent Clause in the FY '86 FLTOP contract. The FY '85 FLTOP contract provided:
1. STATEMENT OF INTENT
a. INTENT

(1) It is understood by all parties to this contract that this is an arrangement, that it is a lease to ownership contract. In that regard, the Government as lessee, contemplates fulfilling that agreement. Further, the Government intends not to terminate this contract prior to completion of its specified Aggregate Contract Term. This includes their intent not to terminate the contract for nonavailability of funds if funds are available during the Aggregate Contract Term to pay for functionally equivalent tasks for which Datapoint equipment have been acquired.

cessive "Renewal Terms" (described below) coinciding with the October 1 to September 30 fiscal year of the Government are contemplated by the parties for an Aggregate Contract Term of 36 months on new business type transactions (DATAPOINT FLTOP) or 24 months on conversion type transactions (DATAPOINT FLTOP C). The Machines to be procured under the DATAPOINT FLTOP C have an expected life equal to or greater than the aggregate contract term selected by the Government.

(2) Subject to the provisions of this Paragraph, the Government has the option to renew the DATAPOINT FLTOP or DATAPOINT FLTOP C each fiscal year for an additional twelve (12) month Renewal Term for the equipment contracted under this Plan until completion of the Aggregate Contract Term specified in Paragraph 2.b.(1), at the prices set forth in the Price List, by giving written notice of renewal to DATAPOINT on the first of October of each fiscal year or as soon as practicable. The Contracting Officer for the Government shall provide written notice of Government's intention to renew at least sixty (60) days prior to the expiration of the initial Term or any Renewal Term. Such notice of intention to renew shall not bind the Government.

\* \* \* \* \* \*

f. DISCONTINUANCE AND TERMINATION

(1) Machines leased under the DATAPOINT FLTOP or DATAPOINT FLTOP C may not be discontinued during a fiscal year except by the Contracting Officer exercising the provisions of "Termination for Convenience of the Government" (FAR 52.249–1:2), or if renewal is not issued pursuant to 2.a.(2) above.

The relevant facts of the six individual claims currently before the court are similar. Due to delays in the negotiations between Datapoint and GSA over the terms and conditions of the FY '86 GSA schedule contract, that contract was not in effect at the start of the 1986 fiscal year and the government agencies were unable to issue delivery orders against its terms. As a result, because the contracting installations in each of the military services involved in this suit had been renting Datapoint equipment in FY '85, and wished to continue their rentals during FY '86, delivery orders were issued at the start of FY '86 against the rental provisions of the FY '85 GSA schedule contract.

The FY '86 GSA schedule contract did not become available until late in the calendar year 1985. By the terms of the FY '86 GSA schedule contract, any government agency renting Datapoint equipment was required to purchase the equipment rented under the extended FY '85 delivery orders outright, cancel the delivery orders, or convert those orders to the FY '86 FLTOP C by January 2, 1986. Five of the contracting installations involved in this suit took affirmative steps to convert their delivery orders to the FLTOP C.[4] The Naval Supply Center, San Diego never amended its delivery order and, the plaintiffs contend, under the automatic conversion language in Special Item 132–1 of the FY '86 GSA schedule contract, that delivery order automatically converted to a FLTOP C.

The United States Army Garrison, Fort Ritchie, Maryland (Claim No. 2), the Navy Supply Center, Norfolk, Virginia (Claim No. 4), and the Marine Corps Air Station, Cherry Point, North Carolina (Claim No. 5), terminated their delivery orders for convenience during FY '87.[5] Scott Air Force

4. Each delivery order in this case is a FLTOP C as a result of the government converting equipment that was previously being rented from the contractor to a lease-to-ownership plan (FLTOP C—Federal Lease to Ownership Plan Conversion). The terms and conditions for the FLTOP and the FLTOP C contained in the FY '86 GSA schedule contract are the same for both programs in all material respects except for one. The FLTOP has an aggregate contract term of 36

months; the FLTOP C's aggregate contract term is 24 months.

5. At oral argument on the cross-motions for summary judgment, the plaintiffs' attorney was asked why they did not seek termination for convenience damages in the alternative to their breach of contract claims for the U.S. Army Garrison, Fort Ritchie, Maryland, Navy Supply Center, Norfolk, Virginia, and the Marine Corps Air Station, Cherry Point, North Carolina. The

Base, Illinois (Claim No. 1), the Navy Supply Center, San Diego, California (Claim No. 3), and Randolph Air Force Base, Texas (Claim No. 6) did not renew their delivery orders at the end of FY '86. The plaintiffs seek $160,449.67, the alleged sum of the unpaid lease payments to the end of the full twenty-four (24) month FLTOP C term for the six delivery orders, plus interest costs and attorney's fees.

## DISCUSSION

█ Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language.[6] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c); Fed.R.Civ.P. 56(c). RUSCC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Volun-*

*tary Employees' Beneficiary Assn. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

As stated in *Webster University v. United States*, 20 Cl.Ct. 429 (1990):

An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987), while the materiality of a fact is determined by reference to applicable legal standards. *Id.*, 833 F.2d at 1567.

*Id.* at 432 (emphasis deleted). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990). The nonmovant must do more than merely raise some doubt as to the existence of a fact; the nonmovant must make a showing sufficient to require submission of the factual dispute to a jury or judge. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557 (Fed.Cir.1988).

Moreover, the facts presented must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. at 147, 90 S.Ct. at 1603. If the moving party has carried its initial burden of showing that there is no genuine issue

---

plaintiffs' attorney, Mr. Geltner, responded that the amount of termination for convenience damages was "too small" and he waived his clients' rights to recover termination for convenience damages. Later, in the same colloquy with the court, plaintiffs' counsel appeared to try to preserve his clients' entitlement to any termination for convenience damages, although he admitted he had not briefed or claimed damages based on termination for convenience.

At no point has the government argued that the plaintiffs are not entitled to termination for convenience damages. However, throughout these proceedings, the government has maintained that in a termination for convenience,

the contractor's recovery is limited to the costs stipulated in the convenience termination clause, principally, the uncompensated cost of furnishing equipment to the date of termination and the cost of settling any subcontractor or employee termination.

6. Since RUSCC 56(c) is closely patterned upon Fed.R.Civ.P. 56(c), precedent under the Fed. R.Civ.P. is relevant to interpreting RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

of material fact, then the nonmoving party bears the burden to present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Uniq Computer*, 20 Cl.Ct. at 228 (stating that the nonmovant "must proffer countervailing evidence sufficient to create a genuine issue of material fact"); and *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 89 (1989) (stating that the party opposing the motion must "prove by sufficient evidence that a genuine issue of material fact positively remains").

When making a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a sufficient disagreement to require submission to fact finding or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984),

*cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional provision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2553; *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is then on the nonmoving party to present evidence in support of its case and show that a genuine factual dispute exists by making a showing sufficient to establish the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.*, 20 Cl.Ct. at 679. The logic behind this addition is simple. If under no scenario can the nonmoving party present the necessary evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may be made by the moving party and succeed, whether or not accompanied by affidavits and other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and other admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. The type of evidence provided by the party opposing summary judgment need not meet the standards for admissibility at trial. The nonmovant, however, must produce evidence beyond the mere pleadings to survive the summary judgment motion and proceed to trial. *Id.*

■ The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981) (holding that it is inappropriate to conclude that because both sides moved for summary judgment that both concede that the case is ready for disposition); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir.1987).

■ The interpretation of a government contract is a matter of law, *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965), and the language of the contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.*, 169 Ct.Cl. at 388, 351 F.2d at 975.

■ The portion of the contract identified by the plaintiffs as at the center of the dispute in the case at bar is the Intent Clause, section 1.a.(1), of the FY '86 FLTOP contract:

> It is understood by all parties to this contract that this is an arrangement, that it is a lease to ownership contract. In that regard, the Government as lessee, contemplates fulfilling that agreement.

Plaintiffs maintain that this Intent Clause means that a government agency breaches the contract when it enters into a FLTOP without the intent to complete the aggregate contract term and take ownership of the equipment.[7] The defendant argues otherwise.

■ Only when the language of a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[W]hen the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." *Peterson–Sharpe Eng'g Corp. v. United States*, 6 Cl.Ct. 288, 295 (1984) (citing *David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977)); *Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Northwestern Industrial Piping, Inc. v. United States*, 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (citing *Duhame v. United States*, 127 Ct.Cl. 679, 683, 119 F.Supp. 192, 195 (1954)).

---

7. Binding case law holds that "... the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury [or judge] might disbelieve him or his witnesses as to this issue." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. at 2514. Considering this precedent, it is surprising that the plaintiffs have moved for summary judgment based on an intent argument. Assuming for argument's sake that the contract language could be found ambiguous, the resolution of this case would turn on the state of mind of the contracting agencies and plaintiff Datapoint at the time they entered the contract and, therefore, summary judgment would be inappropriate.

A contract is unambiguous when it is reasonably open to only one interpretation. *Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc.*, 861 F.2d 1357, 1362 (5th Cir.1988) (citing *Richland Plantation Co. v. Justiss–Mears Oil Co.*, 671 F.2d 154, 156 (5th Cir.1982)). Stated differently, a contract may be found to be ambiguous if the provisions under scrutiny reasonably may be interpreted in at least two ways. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968). Or, a contract is ambiguous when it sustains the interpretations advanced by both parties to the suit. *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 776 (1988) (citing *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970)).

When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors*, 760 F.2d at 1292; *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). Moreover, when making a determination of the existence of an ambiguity, if one contract refers to or incorporates the provisions of another contract, both contracts should be construed together to determine the meaning of the terms and the intent of the parties. *Chicago Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 795 (3d Cir.1945).

The parol evidence rule demands that contract interpretation be unaffected by the contentions of one of the parties that he or she meant something else. "The unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971), *later proceeding, Firestone Tire & Rubber Co. v. United States*, 196 Ct.Cl. 807 (1971); *Singer–General Precision, Inc. v. United States*, 192 Ct.Cl. 435, 446–47, 427 F.2d 1187, 1193 (1970). "The purpose and essence of the rule is to avoid the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning of a contract." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988).

Three of the contracts at issue, those for Scott Air Force Base, Illinois, the Navy Supply Center, San Diego, California, and Randolph Air Force Base, Texas, involved delivery orders which were not renewed by the government at the end of FY '86. Regarding these contracts, the plaintiffs point to the language in the Intent Clause of the FY '86 GSA schedule contract which says: "... the Government, as lessee, contemplates fulfilling that agreement." "Contemplate" is commonly defined as, "to have in view as contingent or probable or as an end or intention; to look forward to; to purpose or intent." Webster's New International Dictionary 574 (2nd ed. 1950). "The fact that the defendant 'contemplated' or 'intended' to perform a certain act may presuppose a moral commitment by the defendant but is contractually unenforceable, at least without more." *Government Sys. Advisors, Inc. & CPT Corporation, Inc. v. United States*, 21 Cl.Ct. 400, 413 (1990), *vacated on other grounds, by order of the court*, Nos. 793–86C and 122–87C, slip op. (Cl.Ct. Dec. 19, 1990) (*GSAI/CPT*). [8]

8. In *GSAI/CPT* (GSAI is the predecessor company to Pacificorp), the government had entered into FLTOP lease agreements with CPT in FY '84. The Intent Clause of that contract contained specific language regarding the government's intent upon entering into the FLTOP lease agreements. *Government Sys. Advisors, Inc. & CPT Corporation, Inc.*, 21 Cl.Ct. at 403. In the *GSAI/CPT* case, the specific intent language of the FY '84 contract was omitted in the Intent Clause of the FY '85 schedule contract with CPT. *Id.* The amended language in the FY '85 contract was identical to the language found in the Intent Clause of the FY '86 FLTOP, at issue in the case currently before this court.

In *GSAI/CPT*, Judge Tidwell vacated his earlier decision granting the government's Motion for Summary Judgment because he had questions concerning the administration of FLTOP contracts. *Government Sys. Advisors, Inc. & CPT Corporation, Inc.*, 25 Cl.Ct. 554 (Cl.Ct.1990). He could not determine from the record whether renewed delivery orders were made against the initial base FLTOP, or against subsequent FLTOPs. If the latter, he wanted to know

As it applies to the case which is now before this court, nothing in the FY '86 GSA schedule contract gives the second sentence of the FY '86 Intent Clause binding legal effect.[9] Nor does the FY '86 contract language speak to "known requirements," or available funding for future fiscal years. In addition, under no reasonable interpretation does the contract language in section 2.a.(2) of the FY '86 FLTOP support the plaintiff's contention that GSA agreed with Datapoint to create a contract which government users could only enter "with the intent to complete the program to ownership of the equipment."

 Section 2.a.(2) of the FY '86 GSA schedule contract gives the government "the option to renew the DATA-POINT FLTOP or DATAPOINT FLTOP C each fiscal year for an additional twelve (12) month Renewal Term...." Moreover, under the provisions of the contract, the government contracting officer is required to provide written notice to Datapoint if the government chooses to exercise its renewal option. There is no contract language, however, in the FY '86 contract which creates an affirmative obligation on the part of a contracting agency to notify Datapoint that the agency would not be renewing a FLTOP contract. Equally significant, are those words of the FY '86 contract which state: "Such notice of intention to renew shall not bind the Government." The terms of the FY '86 contract clearly gave the government the option to review. The plaintiffs are not justified in their insistence that the FY '86 GSA schedule contract created a binding commitment to continue the contract.

Section 2.f.(1) of the FY '86 GSA schedule contract also supports this court's finding that the FLTOP was intended to give the government options to continue or discontinue the relationship with plaintiffs. That section, titled "Discontinuance and Termination", states that the "DATA-

---

whether the changes in the terms and conditions of the later FLTOP contracts affected the renewed delivery orders. If the former, he had questions about how funds from subsequent fiscal year appropriations were obligated on delivery orders made against prior fiscal year base FLTOP contracts.

The grounds upon which Judge Tidwell vacated the *GSAI–CPT* decision do not apply to the case at bar because none of the claims in the case currently before this court involve the FLTOP lease agreement provisions found in the FY '85 GSA schedule contract with Datapoint. Each of the contracting agencies involved in the instant case had been renting, not leasing, Datapoint equipment prior to FY '86. Negotiations over the terms and conditions of the FY '86 contract were not complete at the end of FY '85; consequently, the delivery orders issued at the beginning of FY '86 were issued under the rental provisions of the FY '85 contract. Therefore, the language found in the Intent Clause of the FY '85 FLTOP contract is not applicable to the FLTOPs the government entered in FY '86 in the case before the court.

**9.** The plaintiffs acknowledge that during their negotiations with GSA over the terms of the FY '86 GSA schedule contract, the Intent Clause was modified at the insistence of GSA. This modification resulted in the removal of the third and fourth sentences from the Intent Clause of the FY '85 FLTOP contract.

The change removed the fourth sentence of the FY '85 Intent Clause which had provided that the government intended "not to terminate the contract for nonavailability of funds if funds are available during the Aggregate Contract Term to pay for functionally equivalent tasks for which Datapoint equipment have been acquired." (See note no. 3) The deletion of this provision in the FY '86 agreement further dilutes any conceivable grounds on which the plaintiffs could rely to argue that the Intent Clause should be viewed as a binding agreement.

Moreover, the plaintiffs understood these changes. In a declaration by Stephen E. Markovich, an attorney for Datapoint, which is a part of the record, he states that at the conclusion of negotiations with GSA in the summer of 1985, he was "aware that the language [of the FY '86 FLTOP] no longer entitled Datapoint to claim that renewal was required in the absence of nonappropriation."

Therefore, it is particularly difficult to understand why, in the Complaint, the plaintiffs assert that the government breached the contracts because, "[t]he terms and conditions ... obliged the government to exercise its renewal authority in the event appropriated funds were available and permitted it not to renew the lease only if Congress failed to appropriate funds." Furthermore, it is equally strange that at the same time the plaintiff also contends that, regarding those contracts which were terminated for convenience, the government breached the contract because the termination was implemented "so that the government could acquire equipment from another vendor to perform the same function."

POINT FLTOP or DATAPOINT FLTOP C may not be discontinued during a fiscal year except by the Contracting Officer exercising the provisions of 'Termination for Convenience of the Government' (FAR 52.-249–1:2), or if renewal is not issued pursuant to 2.a.(2) above." This clear provision reiterates the government's established right to discontinue the FLTOP by exercising its right to terminate a contract for the convenience of the government when such action is deemed in the best interests of the government agency involved.

The terms and conditions on the FY '86 agreement are not ambiguous and clearly show that the contract created as a result of the GSA/Datapoint negotiations was intended to give contracting agencies unilateral control over the right to renew the Datapoint delivery orders or to look to another vendor for equipment. The plaintiffs have even acknowledged that the government could exercise options under the terms of the contract. The plaintiffs have been unable to direct this court to any language in the contract which tends to support their argument that the government was bound to continue their contractual relationship with the plaintiffs and that government agencies could only enter the FLTOP with the intent to complete the aggregate contract term and take ownership of the equipment.

 There also is nothing in the language of the FY '86 GSA schedule contract with Datapoint which can be interpreted as continuing or in any manner extending the contract beyond the fiscal year for which it was written. In fact, at oral argument, the parties agreed that by the terms of the FY '86 GSA schedule contract, FLTOP contracts were written for a single fiscal year, and expired on September 30th of the fiscal year for which they were written. Nor, as the plaintiffs have acknowledged in the Markovich Declaration, can the contract properly be construed as absolutely obligating an agency to exercise its renewal option.

The only case law cited by the plaintiffs in support of their position that the government is bound to honor the full twenty-four

(24) months of the projected contract period is *Pacificorp Capital, Inc. & Lanier Business Products, Inc. v. The United States*, 15 Cl.Ct. 663 (1988) (*Pacificorp/Lanier*). *Pacificorp/Lanier* involved four FLTOP contracts similar to the ones at issue here. The court granted the government's Motion for Partial Summary Judgment on one claim against the United States Secret Service because the contract terms applicable to the Secret Service were clear. The court, however, declined to grant the government's Motion for Summary Judgment as to the Federal Aviation Administration, Bureau of Prisons and Veterans Administration claims because the court found that plaintiffs' allegations that, at the time these agencies entered into the FLTOP contracts, they intended only short term rentals of the Lanier equipment, raised genuine issues of material fact. The court concluded, "[i]f this allegation is true, the defendant violated the contract provision that provides: 'Any FLTOP is executed by the Government on the basis that the known requirements exceed the initial term which both parties agree is twelve (12) months or the remainder of one year.'" *Pacificorp Capital, Inc. & Lanier Business Products, Inc. v. United States*, 15 Cl.Ct. at 666.

In contrast to the Lanier contract, the Datapoint contract currently at issue before the court contains only general intent language. The Lanier contract stated: "Any FLTOP is executed by the Government on the basis that known requirements exceed the initial term which both parties agree is twelve (12) months or the remainder of the fiscal year," *Pacificorp Capital, Inc. & Lanier Business Products, Inc. v. United States*, 15 Cl.Ct. at 666, whereas the Datapoint contract at issue here only indicates that the government "contemplates" fulfilling the term of the contract. Furthermore, whereas the Lanier contract explicitly stated that "... there is a reasonable certainty that funds will be available thereafter, to permit exercise of the renewal options granted herein to the Government," *id.*, no comparable language is present in the Datapoint contract. Also, the contract at issue in the *Pacificorp/La-*

*nier* case can be further distinguished from the FY '86 Datapoint contract at issue here by the additional language included in the Datapoint FLTOP. Section 2.a.(2) of the Datapoint contract says that "notice of intention to renew shall not bind the government." There was no such language in the contract at issue in *Pacificorp/Lanier.*

This court is unpersuaded by the plaintiffs' intent arguments and does not find the facts and the holding of the *Pacificorp/Lanier* case applicable to the present circumstances. The FY '86 FLTOP base contract clearly grants an option to the contracting agencies, and the terms of the contract cannot be construed to operate in a manner to make the Intent Clause of the FY '86 contract, currently up for review by this court, binding on the government in the manner interpreted by the plaintiffs. Therefore, the court finds that Scott Air Force Base, Illinois, the Navy Supply Center, California, and the Randolph Air Force Base, Texas, did not breach the FY '86 GSA schedule contract when they made the decision not to renew their delivery orders at the end of FY '86.

The three other contracts at issue before this court, namely those for the United States Army Garrison, Fort Ritchie, Maryland, the Navy Supply Center, Norfolk, Virginia, and the Marine Corps Air Station, Cherry Point, North Carolina, involved delivery orders which were terminated by the government for convenience. Termination for the convenience of the government is provided for in the "Discontinuance and Termination" clause in plaintiffs' FY '86 GSA schedule contract at section 2.f. The FY '86 Datapoint FLTOP says, "Machines leased under the Datapoint FLTOP or Datapoint FLTOP C may not be discontinued during a fiscal year except by the Contracting Officer exercising the provisions of 'Termination for Convenience of the Government' (FAR 52.249–1:2), or if renewal is not issued pursuant to 2.a(2) above [the contract renewal provision]." The plaintiffs contend that those agencies which terminated the contracts for convenience breached the contract because they lacked the legal justification to exercise a

termination for convenience. The government responds that in each instance the contracting agencies properly terminated plaintiffs' contract when the government invoked the standard termination for convenience clause, specifically incorporated into the contracts at issue.

 Under existing regulations, "[t]he Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest." 48 C.F.R. § 52.249–1 (1990). This regulatory provision gives the government a broad right to terminate for the convenience of the government, without cause, but guarantees the contractor entitlement to certain payments, although the contractor's recovery is limited to costs incurred, profit on work done and the costs of preparing the termination settlement proposal. Recovery of anticipated profits is precluded. *See* John Cibinic, Jr. and Ralph C. Nash, *Administration of Government Contracts* 817 (2d ed. 1986).

While the language of the regulation is broad, courts have recognized limitations on the government's right to invoke the doctrine of termination for convenience of the government. In support of their claims, plaintiffs here attempt to rely on the reasoning of two such cases: *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982), and *Municipal Leasing Corp. v. United States,* 7 Cl.Ct. 43 (1984).

In *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982), the court limited the application of the termination for convenience clause to those instances involving "changed circumstances," while refusing to allow the clause to be used by the government to subvert standard contract procedures. *Torncello* involved a requirements contract under which the Navy bound itself to contract with the plaintiff for all of its pest control needs. However, the Navy did not seek any of its requirements for the pest control services at issue from the contractor. Instead, it turned to a lower bidder for those particular services. The Navy knew of that bidder's lower prices at the time it awarded the requirements con-

tract to the plaintiff, and in holding for the plaintiff, the court found that the government had deliberately engaged in "diversion of business away from a party, with whom it had executed a requirements contract, to a competing bidder on the original solicitation." *Torncello*, 231 Ct.Cl. at 20, 681 F.2d at 757. The court also found that when the government entered into an indefinite quantities contract with the knowledge that it could obtain contract performance for pest control services at a lower price from a different vendor, and with the intention that it would not seek any such services from plaintiff, its promises under the contract were illusory, and there was a failure of consideration. *Id.* The court stressed, "[w]e hold in this opinion only that the government may not use the termination for convenience clause to dishonor, with impunity, its contractual obligations." *Torncello*, 231 Ct.Cl. at 47, 681 F.2d at 772.

As stated by the *Torncello* court:

It is important that both of these examples make clear that convenience termination, as it was developing, was intended just to handle changed conditions, relieving the government of the risk of receiving obsolete or useless goods. The risk was shifted to the contractor that it could lose the full benefit of its expectations if circumstances changed too radically.

*Torncello*, 231 Ct.Cl. at 35, 681 F.2d at 765.

Plaintiffs, here, suggest that the *Torncello* decision was pivotal in the court's decision in *Municipal Leasing*, and together that the rationale of these cases show that the contracting activities in the case at bar breached the FLTOPs when they exercised the convenience terminations. *Municipal Leasing*, however, is also easily distinguished from the instant case.

First, the Intent Clause of the *Municipal Leasing* contract is different from the Intent Clause in the instant case. The *Municipal Leasing* clause provided:

It is the intent of the Air Force to exercise the options as specified in SP–04 above. The Air Force shall use its best efforts to obtain appropriations of the necessary funds to meet its obligations and to continue this contract in force. The Air Force shall not replace the leased equipment with functionally similar equipment during the term of the contract.

*Municipal Leasing*, 7 Cl.Ct. at 45. As discussed previously, the Datapoint FLTOP Intent Clause at issue in the case before this court is very general. There is no language even obligating the contracting agency to use "best efforts" to obtain funding for subsequent fiscal years and there are no restrictions placed on the government's ability to contract for "functionally similar equipment."

Also, *Municipal Leasing* can be distinguished from the instant case due to the circumstances surrounding the execution of the contracts. In *Municipal Leasing*, before contracting with the plaintiff for its computer terminals, the Air Force had considered purchasing replacement chips for equipment it already possessed. The Air Force rejected that option because it was unable to purchase a sufficiently small quantity of replacement chips. Ultimately, after notifying plaintiff of its intention to renew, the Air Force decided to pursue the replacement option anyway, did not seek funds for renewal, and did not renew the plaintiff's contract, despite its "best efforts" and "no replacement" promises. In deciding in favor of the plaintiff in *Municipal Leasing*, the court held that, based on the holding in *Torncello*, "[t]he termination for convenience clause will not act as a constructive shield to protect the [government] from the consequences of its decision to follow an option considered but rejected before contracting with plaintiff." *Municipal Leasing*, 7 Cl.Ct. at 47. In the instant case there is neither a return to pre-existing contract options, nor a contractually binding intent provision. In addition, in the case before this court, each of the contracting installations which terminated the contractor for convenience of the government can establish that the FLTOPs were terminated because of genuine changed circumstances.

In the case at bar, the United States Army Garrison, Fort Ritchie, Maryland, the United States Naval Supply Center, Norfolk, Virginia, and the Marine Corps Air Station, Cherry Point, North Carolina, entered into definite quantity contracts with every intention of honoring them. Each contracting activity honored their agreements for over a year on the projected twenty-four (24) month lease contract. Moreover, each of the three contracting installations terminated the lease plan because of actual changes in the circumstances surrounding the original lease plan.

In the Naval Supply Center, Norfolk, Virginia, claim, the Datapoint equipment was initially procured in 1981. In a letter to plaintiff, Datapoint, dated June 19, 1987, the contracting officer wrote: "The Datapoint equipment, as procured in 1981, originally met the government's minimum need for processing capabilities. However, by 1986 the workload had increased to the point where it surpassed the equipment's ability to perform tasks in a timely manner." The contracting officer then listed the specific limitations of the Datapoint equipment that lead to the termination: "(1) The unit's processor speed was too slow to manage the increasing database size. (2) Data storage was virtually non-existent beyond the 1MB standard. (3) Major file searches and printouts were taking in excess of 14 hours to accomplish." The contracting officer concluded his letter by saying: "Therefore, the decision to terminate the lease was based upon the equipment no longer being capable of meeting the government's minimum needs" and that these needs could not have been anticipated. Likewise, in the Fort Ritchie, Maryland, claim, the contracting officer wrote to plaintiffs' counsel on July 1, 1987 that, "the equipment became incompatible with other systems on the installation. This was unacceptable because the user office has a support mission affecting the entire installation." The contracting officer then wrote, "[f]urthermore, it was determined that it would be too expensive to make the DATAPOINT equipment compatible." Likewise, at the Marine Corps, Cherry Point, North Carolina, site, the cost of converting the Datapoint equipment to make it compatible with other equipment purchased at the facility was prohibitive and, therefore, the decision was made to terminate. While these changes may not be sudden or cataclysmic, they certainly represent what would classically be thought of as changed circumstances. The data processing equipment which was leased under each contract either became outdated, incapable of meeting increased demands, or simply too expensive to make it compatible with other equipment in use. The case at bar, therefore, falls squarely within the parameters described for when it is appropriate for the government to utilize the termination for convenience clause, even under the conditions set forth in *Torncello*.

A recent decision issued by the United States Court of Appeals for the Federal Circuit reaffirmed the broad right of the government to terminate a contract for convenience. In affirming a decision of the United States Claims Court in *Salsbury Indus. v. United States*, the Federal Circuit wrote, "[i]t is not the province of the courts to decide de novo where termination was the best course." *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (1990), *reh'g. denied, Salsbury Indus. v. United States*, (Fed.Cir.1990), and *reh'g. denied, en banc, Salsbury Indus. v. United States*, (Fed.Cir.1990), and *cert. denied, Salsbury Indus. v. United States*, —— U.S. ——, 111 S.Ct. 671,.112 L.Ed.2d 664 (1991). " 'In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.' " *Salsbury Indus. v. United States*, 17 Cl.Ct. 47, 55 (1989) (*quoting, John Reiner & Co. v. United States*, 325 F.2d 438, 442, 163 Ct.Cl. 381 (1963)), *aff'd, Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (1990), *reh'g. denied, Salsbury Indus. v. United States*, (Fed.Cir.1990), and *reh'g. denied, en banc, Salsbury Indus. v. United States*, (Fed.Cir. 1990), *and cert. denied, Salsbury Industries v. United States*, —— U.S. ——, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991).

The contracting activities at the Naval Supply Center, Norfolk, Virginia, the United States Army Garrison, Fort Ritchie, Ma-

ryland, and the Marine Corps Air Station, Cherry Point, North Carolina, clearly exercised valid terminations for the convenience of the government. The plaintiffs have not alleged bad faith or abuse of discretion by the contracting officers. Moreover, the authorities cited by the plaintiffs do not support the plaintiffs' contention that those agencies breached the contracts by not fulfilling an alleged twenty-four (24) month contract term.

## CONCLUSION

This court finds no ambiguity in the FY '86 GSA schedule contract with Datapoint currently at issue before this court. Nothing in the language of the contract supports the interpretation offered by the plaintiffs. The meaning of the words included in the contract are clear, and the plaintiffs' interpretation is not supported by the terms and conditions explicitly stated in the contract. For the reasons discussed above, the court finds that Scott Air Force Base, Illinois, Navy Supply Center, San Diego, California, and Randolph Air Force Base, Texas, did not breach the FY '86 GSA schedule contract when they made the decision not to renew their delivery orders. Furthermore, this court finds that the termination for convenience exercised by the United States Army Garrison, Fort Ritchie, Maryland, Navy Supply Center, San Diego, California, and Marine Corps Air Station, Cherry Point, North Carolina, were valid, and in accord with the principles of governing law and that these contracting installations also did not breach the contract by not continuing their contractual relationships with the plaintiffs. The plaintiffs' Motion for Summary Judgment is, therefore, DENIED, and the defendant's Cross-Motion for Summary Judgment is, hereby, GRANTED.

IT IS SO ORDERED.