ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| DLT Solutions, LLC | ) ASBCA No. 63069 |
| | ) |
| Under Contract No. W52P1J-18-A-0001 | ) |

APPEARANCES FOR THE APPELLANT:     Francis E. Purcell, Jr., Esq.
                                   Joseph R. Berger, Esq.
                                   Mona Adabi, Esq.
                                     Thompson Hine LLP
                                     Washington, DC

                                   Brian Lamb, Esq.
                                     Thompson Hine LLP
                                     Cleveland, OH

APPEARANCES FOR THE GOVERNMENT: Craig D. Jensen, Esq.
                                 Navy Chief Trial Attorney
                                 Antonio T. Robinson, Esq.
                                 Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE SWEET
ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal involves a purchase order between the United States Marine Corps (Marine Corps or government) and DLT Solutions, LLC (DLT) to provide perpetual software licenses and maintenance services for a base year, and four option years of software maintenance. The Marine Corps declined to exercise the options.

DLT filed a sponsored claim on behalf of its assignee—Key Government Finance, Inc. (Key)—alleging that the Marine Corps breached the contract, ratified the option year maintenance requirement, and breached the duty of good faith and fair dealing. After the contracting officer denied those claims, this appeal followed.

The complaint alleged five counts. First, the complaint alleges that the Ordering Activity breached the Bona Fide Needs Provision and the covenant of good faith and fair dealing by failing to exercise the options when there was a bona fide need for the software or a functionally similar product (Count I) (compl. ¶¶133- 36). Second, the complaint alleges that the Ordering Activity breached the Certification Provision of the Order and the covenant of good faith and fair dealing by failing to provide a certification that the software had been deleted or disabled if the option was

not exercised (Count II) (*id*. at ¶¶ 137-41).  Counts III, IV, and V were dismissed for lack of jurisdiction (*see*, *DLT Solutions, LLC,* ASBCA No. 63069, 22- 1 BCA ¶ 38,144, familiarity with the facts is presumed).  The government filed its answer, alleging an affirmative defense of "release, accord and satisfaction, assumption of the risk, payment, and waiver" (answer at 9).

Both parties move for summary judgment.  Because there are no genuine issues of material fact supporting the breach of contract, ratification, and part of breach of the duty of good faith and fair dealing allegations, we grant the government's motion for summary judgment—and deny DLT's motion for summary judgment—on those issues.  However, because there is a genuine issue of material fact as to the remaining part of the breach of the duty of good faith and fair dealing allegation, we deny both parties' cross-motions for summary judgment as it pertains to that separate issue.  For the reasons stated below, the breach of the Bona Fide Needs Provision portion of the complaint is stricken from Count I; however, the breach of the covenant of good faith and fair dealing remains.  Count II is stricken in its entirety.

### STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

I.      *The Federal Supply Schedule Contract, the Blanket Purchase Agreement, and the Quest Agreement*

1.  From April 11, 2016 to April 10, 2021, DLT had a General Services Administration Federal Supply Schedule Contract for various software licenses and maintenance, including Quest software (R4, tab 115-9 at 1-2).  The Quest software consisted of three components: (1) the Recovery Manager for Active Directory; (2) the Change Auditor for Windows Files Servers; and (3) GPO Admin (app. supp. R4, tab 102 at 1581, tab 199 at 911).  Under the heading "Period of Term Licenses . . . and Maintenance," the Federal Supply Schedule Contract stated that:

> (b)     Term licenses and/or maintenance may be discontinued by the ordering activity on thirty (30) calendar days written notice to the contractor.
>
> . . . .
>
> (e)     Ordering activities should notify the contractor in writing thirty (30) calendar days prior to the expiration of an order, if the term licenses and/or maintenance is to be terminated at that time.

(R4, tab 115-9 at 24)

2

2.  On November 20, 2017, the Army Contracting Command, Rock Island, Illinois—on behalf of the United States Department of Defense Enterprise Software Initiative—awarded Blanket Purchase Agreement W52P1J-1B-A-001 (the Blanket Purchase Agreement) to DLT in order to reduce the administrative cost of acquiring commercial products and services from the Federal Supply Schedule Contract (R4, tab 1 at 1, 3).  The Blanket Purchase Agreement allowed the government "to evaluate license usage at the end of option periods and terminate, without penalty, unused licenses upon mutual agreement that the identified licenses are unused" (R4, tab 1 at 9).  The Blanket Purchase Agreement's order of precedence clause stated that "[t]he provisions of [Federal Acquisition Regulation] 52.212-4 specified in [Federal Acquisition Regulation] 12.302, as required by Federal law, shall prevail over any terms of the commercial license or any additional negotiated terms at the order level" (R4, tab 1 at 4-5).  Federal Acquisition Regulation (FAR) 52.212-4, in turn, stated that the schedule of supplies and services took precedent over attachments.  FAR 52.212-4(s), CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT  2017).

3.  Included with the Blanket Purchase Agreement was the Quest software transaction agreement (Quest Agreement).  The Quest Agreement defined the term "software" as "the object code version of the software that is provided or made available to Customer pursuant to an Order as well as any corrections, enhancements, and upgrades to such software that are made available to Customer pursuant to this Agreement, and all copies of the foregoing."  (R4, tab 115-8 at 16)  Under the "Software License" section, the Quest Agreement stated that "[s]ubject to the terms of this Agreement, Quest grants to Customer, and Customer accepts from Quest, a non-exclusive, non-transferable . . . and non-sublicensable license to access and use the quantities of each item of Software identified in the applicable Order within the parameters of the Product Terms associated with the applicable Software and License Type" (*id.*).

4.  The Quest Agreement separately defined "maintenance Services" as "Quest maintenance and support offering for the Products as identified in the Maintenance Services Section below" (*id.*).  The Quest Maintenance Services Section stated that:

> (a)     Except as otherwise stated in an Order or an amendment to this Agreement, during any Maintenance Period and for the applicable fees, Quest shall:
>
> > (i)      Make available to Customer new versions and releases of the Software, including Software corrections, enhancements and upgrades, if and when Quest makes them generally available without charge as part of Maintenance Services.

3

>> (ii)     Respond to communications from Customer that report Software failures not previously reported to Quest by Customer. . . .
>>
>> (iii)    Respond to requests from Customer's technical coordinators for assistance with the operational/technical aspects of the Software unrelated to a Software failure. . . .
>>
>> (iv)     Provide access to Quest software support web site . . . .

(*Id*. at 18)[1]  The Quest Agreement did not impose the parameter on the Marine Corps' access and use of the Quest software of requiring that the software license include maintenance.  On the contrary, the Maintenance Services Section also stated that "[c]ancellation of Maintenance Services for perpetual Licenses for On-Premise Software will not terminate Customer's rights to continue to use the On-Premise Software." (*Id*. at 19)

## II.     *Purchase Order*

5.  We take judicial notice of the fact that the Marine Corps Systems Command was the procuring agency, and the Marines Force Cyberspace Operations Group was the client agency.  MARINE CORPS SYSTEMS COMMAND, https://www.marcorsyscom.marines.mil (last visited Feb. 5, 2024); U.S. MARINE CORPS FORCES CYBERSPACE COMMAND, https://www.marforcyber.marines.mil (last visited Feb. 5, 2024).

6.  In 2018, the Marine Corps had about 180,000 licenses for Quest software, but determined that it needed additional licenses (app. supp. R4, tab 14 at 1,876-77, tab 17 at 1,873, tab 19 at 1,861-62).  The Marine Corps also determined that it needed maintenance for the Quest software (app. supp. R4, tab 14 at 1,876-77, tab 17 at 1,873, tab 19 at 1,861-62).

7.  The Marine Corps Systems Command began conducting market research about acquiring additional licenses for Quest software, and maintenance for the existing and new licenses, from DLT (app. supp. R4, tab 14 at 1,876-77, tab 17 at 1,873, tab 19 at 1,861-62).

---

[1] The Federal Supply Schedule Contract similarly defined maintenance as including "the publishing of bug/defect fixes via patches and updates/upgrades in function and technology to maintain operability and usability of the software product" (R4, tab 115-9 at 23).

8. In a Limited Source Justification and Approval[2] the Marine Corps Systems Command indicated that there was a need for the Quest software licenses and maintenance, and that only Quest resellers could provide the licenses and maintenance (app. supp. R4, tab 199 at 910-13).

9. However, on October 30, 2018, William Pilcher—the Enterprise Tools Technical Lead of the Marines Force Cyberspace Operations Group—sent an email to Joni Ong—a Marine Corps Systems Command project officer (app. supp. R4, tab 49 at 482)—stating that the Marines Force Cyberspace Operations Group no longer needed the GPO Admin, and was reviewing the need for the Change Auditor (app. supp. R4, tab 107 at 1519). Ms. Ong forwarded that email, stating that the Marine Corps no longer needed GPO Admin, but still needed the Quest licenses for Change Auditor and Recovery Manager for Active Directory (*id*. at 1516).

10. On January 29, 2019, the Marine Corps Systems Command sent a Request for Quote to DLT for a base year for Quest licenses and maintenance, and four option years for maintenance (app. supp. R4, tab 198 at 908; tab 200 at 918-41; tab 204 at 1145).

11. Key provided an initial quote for financing to DLT on February 5, 2019. Key required that DLT include provisions in its response to the Marine Corps that it was the Marine Corps' intent to renew options so long as there was a bona fide need, and that the government would remove, and certify the removal of, all software at termination of the contract (app. supp. R4, tab 227 at 622).

12. On February 6, 2019, DLT submitted its initial quote, with the language requested by Key (app. supp. R4, tab 229 at 643).

13. On February 27, 2019, Contracting Officer Chambers emailed DLT, stating that:

> I understand that this is a relatively high dollar value buy and that the way that Dell/Quest handles their channel partners with respect to multiple year requirements has a significant impact to your revenue recognition, cash flow, and financial risk. Unfortunately, there are several areas in

---

[2] Someone inexplicably redacted the Limited Source Justification and Approval's date (app. supp. R4, tab 199 at 916).

the language with which the Federal Government cannot agree.

(App. supp. R4, tab 256 at 836)

14. Following negotiations, the parties agreed on final quote number 4678511 (Quote) on March 12, 2019. That Quote contained the following Bona Fide Needs Provision:

> It is the intent of the Government by placing this Order to exercise each renewal option so long as the bona fide needs of the Government for the product or functionally similar products continues to exist and the requirements of [Federal Acquisition Regulation] 17.207 are satisfied.

(App. supp. R4, tab 278 at 2,400) Federal Acquisition Regulation 17.207 provided that:

> (c)     The contracting officer may exercise options only after determining that—
>
> (1)     Funds are available;
>
> (2)     The requirement covered by the option fulfills an existing Government need;
>
> (3)     The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors (see paragraphs (d) and (e) below) considered;
>
> (4)     The option was synopsized in accordance with Part 5 unless exempted . . . ;
>
> (5)     The contractor is not listed in the System for Award Management Exclusions . . . ;
>
> (6)     The contractor's past performance evaluations on other contract actions have been considered; [and]

(7)     The contractor's performance on this contract has been acceptable, *e.g.*, received satisfactory ratings.

(d)     The contracting officer, after considering price and other factors, shall make the determination on the basis of one of the following:

(1)     A new solicitation fails to produce a better price or a more advantageous offer than that offered by the option. . . .

(2)     An informal analysis of prices or an examination of the market indicates that the option price is better than prices available in the market or that the option is the more advantageous offer.

(3)     The time between the award of the contract containing the option and the exercise of the option is so short that it indicates the option price is the lowest price obtainable or the more advantageous offer.

FAR 17.207, EXERCISE OF OPTIONS (OCT 2017).

15.  The Quote also contained the following Certification Provision:

Within (30) days after the date of expiration or termination of any Order in which the Government has not exercised a purchase option to acquire the software license, the Government shall, at its own risk and expense, have the software removed.  In connection with such removal of software, the Government shall certify in writing to the Contractor that the Government has (a) deleted or disabled all files and copies of the software form the equipment on which it was installed; [and] (b) has no ability to use the returned software.

(App. supp. R4, tab 278 at 2,400)

16.  On March 13, 2019, DLT and the Marine Corps Systems Command executed purchase order M6785419F4035 (Purchase Order) off the Blanket Purchase Agreement.  The Purchase Order attached the Quote, and stated that

7

"DLT Solutions quote number 4678511 dated March 12, 2019 is hereby incorporated and attached hereto." (App. supp. R4, tab 286 at 2,108, 2,143) The Purchase Order consisted of one base year, and four option years. The Purchase Order base year had separate contract line item numbers (CLINs) for "Quest Perpetual License" and "Premier Support," which included maintenance. The option years were for maintenance only, and not for Quest software licenses. (App. supp. R4, tab 286 at 2,108-36) The option CLINs stated that:

> Option . . . to be exercised as a unilateral right of the government by written contract modification signed by a contracting officer in accordance with [Federal Acquisition Regulation] 52.217-9 per the terms of this delivery order. Should the government unilaterally choose not to exercise the option, no further contract action is required.

(R4, tab 2 at 40, 45, 50, 56) FAR 52.217-9 stated that "[t]he Government may extend the term of this contract by written notice to the Contractor provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 30 days before the contract expires. FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (OCT 2017). The preliminary notice does not commit the Government to an extension." (R4, tab 2 at 63) The Purchase Order did not impose the parameter on the Marine Corps' access and use of the Quest software of requiring that the software license include maintenance (R4, tab 2).

17. On March 15, 2019, DLT placed three purchase orders with Quest for licenses, maintenance on the new licenses through February 28, 2023, and maintenance on the existing licenses through February 28, 2021 (app. supp. R4, tab 463 at 1,484-88, tab 462 at 1,482, tab 464 at 1,490).

18. On March 15, 2019, Key sent DLT a letter of intent to release funds to DLT (app. supp. R4, tab 300 at 1,065).

19. Also on March 15, 2019, DLT sent Contracting Officer Christopher Chambers a Notice of Assignment, which indicated that DLT was assigning all monies due to DLT under the Purchase Order to Key and attached the Instrument of Assignment between DLT and Key (app. supp. R4, tab 533 at 1,024-25).

20. On March 28, 2019, Mr. Pilcher sent an email to Ms. Ong, stating that, "we really do not require Quest licensing any longer for the [GPO Admin], [Recovery Manager for Active Directory] and Change Auditor" (app. supp. R4, tab 413 at 984-85). At her deposition, Ms. Ong gave the following answers to the following questions:

> Q: But didn't [Mr. Pilcher] say [in the March 28, 2019 email]—didn't he use the word licensing in his item No. 5 there?
>
> A: Yes. They don't differentiate between maintenance and licensing. They are just operator administrator[s].
>
> Q: So by licensing, you believe he included maintenance within his meaning?
>
> A: Yes.

(R4, tab 113 (Ong Depo.) at 87-88) There is no evidence that Ms. Ong was an authorized government representative for the purposes of binding the government to an interpretation of the contract.

21. On March 29, 2019, Ms. Ong responded to Mr. Pilcher, "[w]e'll discontinue procurements for Quest next year" (app. supp. R4, tab 413 at 984).

22. On March 29, 2019, DLT and Contracting Officer Chambers executed Modification No. P00001, which incorporated the Instrument of Assignment and Notice of Assignment into the Purchase Order (app. supp. R4, tab 403 at 1,035). At his deposition, Contracting Officer Chambers gave the following answers to the following questions:

> Q: And if the day before you executed [modification P00001] on March 29, if someone in the Agency had emailed you the day before on March 28 and said, to summarize, we really do not require Quest licensing any longer for [GPO Admin], [Recovery Manger for Active Directory], and Change Auditor, what would you have done?
>
> A: I would have tried to understand why, why did they have me construct the contract the way that they did, what is it that we are doing, why do we no longer require those things.
>
> Q: And would you have then entered into [modification P00001] the following day with DLT?
>
> A: I think that I probably would have had some conversations.
>
> Q: Conversations with whom?

9

A: Both DLT and Key.

Q: And what actions do you think they might have taken if they had known that the Agency did not intend to exercise the options?

A: By they, you mean DLT and/or Key?

Q: Yes.

MR. ROBINSON: Objection, speculation.

THE WITNESS: I have no idea. But to your point, I think in the interest of good faith, I would have tried to figure out something that was equitable.

(R4, tab 114 (Chambers Depo.) at 119-20)

23. On March 29, 2019, Key wired funds to DLT (app. supp. R4, tab 402 at 874).

24. In late March 2019, Quest began providing the licenses to the Marine Corps (*see, e.g.*, app. supp. R4, tab 471 at 856).

25. After learning that the Marine Force Cyberspace Operations Group determined that it no longer needed the Quest software, Contracting Officer Chambers emailed on April 3, 2019, that:

> I'm sorry but this is absolutely infuriating. This lack of planning on the part of the requiring organization is incomprehensible and irresponsible; the requirement was validated multiple times over the past 8-10 months.
>
> The only way that Quest would sell us the potential for four years of requirement was to have their reseller take a loan from a bank in order to pay Quest the full four-year sum. The contractor has done that and now, not even a month after award, we are deciding that we don't need any options because we don't want to use those products??? The contractor and the bank understand that the options are optional, but this paints us as disingenuous in the worst way.
>
> We must do better.

(App. supp. R4, tab 420 at 1,987)

26. After several other emails discussing the need for a 24-month software roadmap, Margaret Toth—the Marine Corps Systems Command Deputy Program Manager—responded to Contracting Officer Chambers in an April 4, 2019 email that:

> I also think that we need to find ways to educate our requiring organizations on the impacts of such decisions. Until recently I assumed that software license options years were similar to service contract option years in nature, i.e., there's not necessarily a "loss" to the vendor if we don't exercise. A 24-month software roadmap doesn't help a contractor who has taken a loan to pay for four years, when we've optioned out the repayment.

(App. supp. R4, tab 420 at 1,986)

27. On March 2, 2020, DLT emailed Contracting Officer Chambers indicating that it had not received a notice of intent for the first option year, and inquiring whether the government intended to exercise the option (app. supp. R4, tab 511 at 569). The Marine Corps responded that Mr. Chambers no longer was the contracting officer, and that the Marine Corps would not exercise the option for maintenance (*id*. at 567-69).

28. There is no evidence that the Marine Corps certified in writing to DLT that the Marine Corps had: (a) deleted or disabled all files and copies of the software from the equipment on which it was installed; and (b) has no ability to use the returned software.

III. *DLT's Claim and Removal of the Quest Software*

29. On March 22, 2021, DLT submitted a certified claim (app. supp. R4, tab 483 at 610).

30. In response, the Marine Corps determined that Quest software remained on its systems (app. supp. R4, tab 537 at Change Auditor Summary Tab, tab 538 at 842). Due to cybersecurity concerns arising from the fact that Quest no longer supported the software, the Marine Corps removed the Quest software by April 20, 2021 (app. supp. R4, tab 502 at 865-66, tab 503 at 2,495, tab 552 at 2,494, tab 542 at 857; tab 543 at 869-70). There is no evidence that the Marine Corps used maintenance on any of the Quest software that remained on its systems after the base year.

31.  On July 23, 2021, the new contracting officer, Stasia Baker, issued a final decision denying DLT's claim (app. supp. R4, tab 520 at 555-61).

32.  This timely appeal followed (app. supp. R4, tab 526 at 537).

DECISION

The government—and not DLT—is entitled to summary judgment on DLT's breach of contract, ratification, and breach of the duty of good faith and fair dealing allegations based upon a purported failure to exercise the option after determining pre-award that it needed the software and maintenance.  However, neither party is entitled to summary judgment on the breach of the covenant of good faith and fair dealing claim based upon the purported failure to disclose that the Marine Corps had decided not to exercise the option before DLT completed its financing.

I.    *Summary Judgment Standard*

We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  All significant doubt over factual issues must be resolved in favor of the party opposing summary judgment.  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  In deciding summary judgment motions, we do not resolve controversies, weigh evidence, or make credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Moreover, we draw all reasonable inferences in favor of the non-movant.  *Id.*  A genuine issue of material fact arises when the non-movant presents sufficient evidence upon which a reasonable fact-finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant.  *C Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

II.   *There Is No Genuine Issue of Material Fact Suggesting That the Marine Corps Breached the Contract*

The government is entitled to summary judgment on DLT's breach of contract claims.  The elements of a breach of contract claim are: (1) a valid contract between the parties; (2) an obligation or duty on the part of the government arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.  *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,284.  It is the appellant's burden to prove each breach of contract claim element.  *Action Support Serv. Corp.*, ASBCA No. 46800, 00-1 BCA ¶ 30,701 at 151,682.

Our analysis of the obligation and duties of the parties requires us to interpret the contract.  In interpreting a contract, "clear and unambiguous [contract provisions]

12

must be given their plain and ordinary meaning . . . ." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*). "An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." *E.L. Hamm & Assoc., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004). "[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965). Thus:

> We must seek to put ourselves in the position of appellant at the time he bid on the contract, *i.e.*, we must seek the meaning that would be attached to the language by a reasonably intelligent bidder in the position of appellant, who would be expected to have the technical and trade knowledge of his industry and to know how to read and interpret technical engineering specifications and perform construction work in accordance with such specifications.

*Adrian L. Roberson*, ASBCA No. 6248, 61-1 BCA ¶ 2,857, at 14,915. Moreover, "we read the contract as a whole, giving meaning to all of its parts, and without leaving a portion of the contract useless, inexplicable, void, or superfluous." *JAAT Technical Serv., LLC*, ASBCA No. 61180, 19-1 BCA ¶ 37,297 at 181,429 (quotation omitted).

Here, as discussed below, there is no genuine issue of material fact suggesting that the government breached any part of the contract—namely t the Blanket Purchase Agreement, or the Bona Fide Needs or Certification Provisions of the Purchase Order.[3]

A. *There Is No Genuine Issue of Material Fact Suggesting That the Marine Corps Breached the Blanket Purchase Agreement*

DLT has failed to raise a genuine issue of material fact suggesting that the Marine Corps breached the Blanket Purchase Agreement by declining to exercise the option without DLT's assent, as DLT argues is necessary (app. br. at 75-76). To be sure, the Blanket Purchase Agreement allowed the Marine Corps "to evaluate license usage at the end of option periods and terminate, without penalty, unused licenses upon mutual agreement that the identified licenses are unused" (SOF ¶ 2). That is not

---

[3] It appears that DLT also argues that the Marine Corps breached the Federal Supply Schedule Contract by failing to give written notice of the decision not to exercise the option within 30 days of that decision (app. mot. at 74). However, we would not possess jurisdiction over that claim because it would require us to interpret the Federal Supply Schedule, which we cannot do under FAR 8.406-6. *Xerox Corp.*, 13-1 BCA ¶ 35,413, at 173,730-31(citing *Sharp Elec. Corp. v. McHugh*, 107 F.3d 1367, 1374 (Fed. Cir. 2013)).

relevant here, however, because DLT is challenging a decision not to exercise options for maintenance; not to "terminate . . . unused licenses" (SOF ¶¶ 16, 27). Moreover, the Blanket Purchase Agreement only required mutual agreement to terminate unused licenses "at the end of option periods . . . ." (SOF ¶ 2). Here, the Marine Corps decided not to exercise the option at the end of the base year (SOF ¶ 27). Thus, DLT has failed to raise a genuine issue of material fact suggesting that the Marine Corps breached the Blanket Purchase Agreement.

B. *There Is No Genuine Issue of Material Fact Suggesting That the Marine Corps Breached the Bona Fide Needs Provision of the Purchase Order*

There is no genuine issue of material fact suggesting that DLT can meet its burden of showing that the Marine Corps breached the Bona Fide Needs Provision of the Purchase Order by declining to exercise the option. The Bona Fide Needs Provision stated that:

> It is the intent of the Government by placing this Order to exercise each renewal option so long as the bona fide needs of the Government for the product or functionally similar products continues to exist and the requirements of [Federal Acquisition Regulation] 17.207 are satisfied.

(SOF ¶ 14 (emphasis added)).[4] Even assuming without deciding that there was a bona fide need for the maintenance in order to comply with internal Marine Corps policies, the Marine Corps is entitled to summary judgment on DLT's breach of the Bona Fide Needs Provision claim because a reasonable fact-finder could not decide that the Bona Fide Needs Provision was anything but a contractually-unenforceable expression of intent, and alternatively could not decide that the FAR 17.207 requirements were met.

1. *The Bona Fide Needs Provision Is a Contractually-Unenforceable Expression of Intent*

---

[4] Because the option was only for the maintenance—and not for the Quest software licenses—a reasonably intelligent person would understand that the word "product" in the Bona Fide Needs Provision meant the maintenance; and not the Quest software licenses (SOF ¶¶ 14, 16). In any event, even if the word "product" referred to the Quest software licenses, the Bona Fide Needs Provision still would be a statement of intent, and DLT still would have failed to raise a genuine issue of material fact suggesting that it can meet its burden of showing that the requirements of FAR 17.207 are satisfied, for the reasons discussed above.

14

A reasonable fact-finder could not decide that the Bona Fide Needs Provision was anything but a contractually-unenforceable expression of intent. "The fact that [the government] . . . 'intended' to perform a certain act may presuppose a moral commitment by the [defendant], but is contractually-unenforceable, at least without more." *Pacificorp Capital, Inc. v. United States*, 25 Cl. Ct. 707, 716 (1992). While *Pacificorp* is not binding upon us, it is persuasive because it is consistent with the general rule that "[a] person may express an intention to do something in the future without promising to do it. . . . A statement of intention is the mere expression of a state of mind, put in such a form as neither to invite nor to justify action in reliance by another person." 1 CORBIN ON CONTRACTS §1.15 (2023). Moreover, *Pacificorp* is consistent with our decision in *Supplycore, Inc.*, ASBCA No. 58676, 16-1 BCA ¶ 36,262 at 176,907. In *Supplycore*, we held that a contractor may not reasonably rely upon a government communication indicating that the government intended to exercise an option to conclude that that government actually exercised the option because FAR 52.217-9(a)—which the Purchase Order incorporated here—stated that "preliminary notice [of intent] does not commit the Government to an extension."[5] *Id*. at 176,905, 176,907; (SOF ¶ 16). Thus, we follow *Pacificorp*'s holding that a mere expression of intent is contractually-unenforceable.

Here, by its plain language, the Bona Fide Needs Provision merely expressed "the intent of the Government" at the time the Contract was executed. There is no suggestion that the government's intent would remain unchanged. (SOF ¶ 14). Therefore, the Bona Fide Needs Provision is contractually-unenforceable.

Indeed, adopting DLT's reading the Bona Fide Needs Provision would violate our duty not to leave a portion of the contract useless, inexplicable, void, or superfluous if possible. *JAAT Technical Serv.*, 19-1 BCA ¶ 37,297 at 181,429. Reading the Bona Fide Needs Provision as imposing a contractually-enforceable duty upon the Marine Corps to exercise the option if there was a bona fide need would create an inconsistency with the schedule, which stated that:

> Option . . . to be exercised as a <u>unilateral right</u> of the government by written contract modification signed by a contracting officer in accordance with [Federal Acquisition Regulation] 52.217-9 per the terms of this delivery order.

---

[5] In fact, DLT goes so far as to argue that the Bona Fide Needs Provision constituted a notice of intent under FAR 52.217-9, and that no further action was required to exercise the option (app. mot. 74). Even if we were to read the Bona Fide Needs Provision as a notice of intent, as discussed above, any such notice of intent would not commit the Marine Corps to exercise the option under FAR 52.217-9(a) and *Supplycore*.

15

Should the government <u>unilaterally choose</u> not to exercise the option, no further contract action is required.

(SOF ¶ 16 (emphasis added)). Even if it were not possible to avoid such an inconsistency, the schedule language would govern under the order of precedence clause because the Bona Fide Needs Provision is only in an attachment (SOF ¶¶ 2, 16).

DLT argues that the schedule is consistent with the Bona Fide Needs Provision because the schedule's "per the terms of this delivery order" modifying phrase qualifies the "unilateral right of the government" language, and therefore subjects the government's unilateral right to the limitations in the Bona Fide Needs Provision (app. reply at 18). However, the general rule is that a "modifying phrase attaches to its closest referent." *Pennzoil-Quaker State Co. v. United States*, 511 F.3d 1365, 1373 (Fed. Cir. 2008). The "per the terms of this delivery order" modifying phrase was closer to the "by written contract modification signed by a contracting officer in accordance with [Federal Acquisition Regulation] 52.217-9" referent than the "unilateral right of the government" referent (SOF ¶ 16). Therefore, the "per the terms of this delivery order" modifying phrase attached to the "by written contract modification signed by a contracting officer in accordance with [Federal Acquisition Regulation] 52.217-9" referent. And indeed, that makes sense because the terms of the delivery order included FAR 52.217-9. (SOF ¶ 16). To the extent that there is any doubt, the reiteration of the unilateral language without a modifying phrase qualifying or limiting that language in the next sentence of the schedule confirms the intent that the government's unilateral right not be qualified or limited. (SOF ¶ 16).

2. *DLT Has Not Shown That the Federal Acquisition Regulation 17.207 Requirements Were Met*

Nor could a reasonable fact-finder decide that DLT met its burden of showing that the requirements of FAR 17.207 were satisfied. FAR 17.207(c) stated that the contracting officer only may exercise an option if he determines that:

(1)     Funds were available;

(2)     The requirement covered by the option fulfilled an existing government need;

(3)     The exercise of the option was the most advantageous method of fulfilling the government's need, price and other factors;

(4)     The option was synopsized unless exempted;

16

(5)     The contractor was not listed in the System for Award
         Management Exclusions;

(6)     The contracting officer considered the contractor's past
         performance evaluations on other contract actions; and

(7)     The contractor's performance on this contract had been
         acceptable.

(SOF ¶ 14).

Further, FAR 17.207(d) provided that the contracting officer must base that determination to exercise an option upon a finding of at least one of the following:

(1)     A new solicitation failed to produce a better price or a more
         advantageous offer than that offered by the option;

(2)     An informal analysis of prices or an examination of the market
         indicated that the option price was better than prices available in
         the market or that the option was the more advantageous offer; or

(3)     The time between the award of the contract containing the option
         and the exercise of the option was so short that it indicated the
         option price was the lowest price obtainable or the more
         advantageous offer.

(SOF ¶ 14).

Here, beyond a conclusory assertion that the requirements of FAR 17.207 were satisfied, DLT has failed to even argue—let alone point to evidence raising a genuine issue of material fact suggesting—that all of the FAR 17.207 requirements were met (app. mot. at 58-60).

Instead, DLT argues that FAR 17.207(d) imposed an obligation upon the contracting officer to make a determination as to whether the requirements of FAR 17.207 were met, which he failed to satisfy (app. mot. at 58-59). DLT apparently relies upon the mandatory "shall" language in FAR 17.207(d)'s statement that the "contracting officer . . . shall make the determination on the basis of one of the following . . . ." (SOF ¶ 14). However, FAR 17.207(d) must be read in the context of FAR 17.207(c) because "the determination" referenced in FAR 17.207(d) is the determination in FAR 17.207(c). FAR 17.207(c) stated that "[t]he contracting officer <u>may</u> exercise options <u>only after</u> determining that" the FAR 17.207(c) requirements

17

were met.  FAR 17.207(c), EXERCISE OF OPTIONS (OCT 2017) (emphasis added).
By using the permissive "may," and "only after," language FAR 17.207(c) made it
clear that the contracting officer had the discretion to exercise an option—and that he
only needed to make the determination as to whether the requirements of
FAR 17.207(c) were met if he exercised the option.  FAR 17.207(d) merely mandated
that any discretionary determination made in FAR 17.207(c) be based upon the
additional finding that one of the criteria under FAR 17.207(d) also was met (SOF ¶
14).  Indeed, the only requirement contained in FAR 17.207 for a written finding by
the contracting officer was contained in subsection (f), which required such a written
finding "[b]efore exercising an option," but said nothing about what was required
before declining to exercise one.

In sum, there is no genuine issue of material fact suggesting that the
government breached the Bona Fide Needs Provision.

C. *There Is No Genuine Issue of Material Fact Suggesting That the Marine
Corps Breached the Certification Provision of the Purchase Order*

The Marine Corps are entitled to judgment as a matter of law on DLT's breach
of the Certification Provision claim because there is no genuine issue of material fact
suggesting that the Marine Corps had a duty to remove, or certify the removal of, the
Quest software in this appeal.  The plain language of the Certification Provision
unambiguously only required the Marine Corps to remove, and certify the removal of,
the Quest software "[w]ithin (30) days after the date of expiration or termination of
any Order in which the Government has not exercised a purchase option to acquire the
software license . . . ." (SOF ¶ 15 (emphasis added)).  Here, a reasonable fact-finder
could not decide that the expired Order was one in which the Marine Corps had not
exercised a purchase option to acquire Quest software licenses.  On the contrary, the
purchase options that the Marine Corps declined to exercise undisputable were to
acquire maintenance on those licenses.  (SOF ¶ 16).  In fact, no reasonable contractor
could interpret the options as being for software licenses because the Marine Corps
already had perpetual licenses in the Quest software.  (SOF ¶ 16).  Because no
reasonable fact-finder could decide that the condition that triggered the Marine Corps'
obligation to remove, and certify the removal of, the Quest software under the
Certification Provision existed—namely that the expired order be one in which the
government had not exercised a purchase option to acquire the software license—there
is no genuine issue of material fact suggesting that the Marine Corps had a duty under
the Certification Provision to remove, and certify the removal of, the Quest software in
this appeal.

DLT argues that the term "software license" included maintenance because
Ms. Ong purportedly testified that she did not differentiate between maintenance and
licensing (app. mot. at 40-41).  However, "clear and unambiguous contract provisions

18

must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18- 1 BCA ¶ 37,007 at 180,236 (quoting *Coast Fed. Bank*, 323 F.3d at 1040 (quotation and citation omitted)). If we do resort to extrinsic evidence, "[o]nly an authorized government representative may bind the government to an interpretation of a contract." *Gen. Dynamics-Nat'l Steel and Shipbuilding Co.*, ASBCA No. 61524, 22- 1 BCA ¶ 38,067 at 184,826. Here, the Purchase Order contract line item numbers unambiguously distinguished between the Quest Perpetual License on the one hand and the support or maintenance on the other hand; and the option years unambiguously were only for support or maintenance (SOF ¶ 16). Therefore, we may not resort to extrinsic evidence. Even if we could, there is no evidence that Ms. Ong was an authorized government representative for the purposes of binding the government to an interpretation of a contract (SOF ¶ 20). On the contrary, she was not the contracting officer (SOF ¶ 9). In any event, Ms. Ong did not even purport to interpret how the Marine Corps understood the term "software license" in the Certification Provision. Instead, she merely testified that operator administrators did not differentiate between maintenance and licenses (SOF ¶ 20).

DLT also points to the Quest Agreement in an attempt to show that the term "software license" in the Certification Provision included maintenance (app. mot. at 42-43). However, the Quest Agreement confirms that the software license was distinct from maintenance by defining software and maintenance separately without reference to each other, addressing the software licenses and maintenance in separate sections, and acknowledging that maintenance requires a separate fee from the software licenses (SOF ¶¶ 3-4). While the Quest Agreement software license section granted the Marine Corps the right to access and use the software "within the parameters of the Product Terms" in the Quest Agreement and the Purchase Order (SOF ¶ 3), that did not render the maintenance part of the software license because neither the Quest Agreement nor the Purchase Order imposed the parameter on the Marine Corps' access and use of the Quest software of requiring that the software license include maintenance (SOF ¶¶ 4, 16). On the contrary, the Quest Agreement expressly stated that "[c]ancellation of Maintenance Services for perpetual Licenses for On-Premise Software will not terminate Customer's rights to continue to use the On-Premise Software" (SOF ¶ 4). Thus, far from contradicting the conclusion that the term "software license" did not include maintenance, the Quest Agreement supported that conclusion.

Contrary to DLT's next argument (app. resp. at 8), our reading of the Certification Provision does not render it useless, inexplicable, or void. Rather, we merely recognize that the plain language included a condition that did not occur— namely that the expired order be one in which the government had not exercised an option to acquire a software license. (SOF ¶ 15) To the extent that that condition could not have occurred, any resulting uselessness, inexplicability, or voidness arises

from DLT's inclusion of a condition that could not occur; and not our reading of the plain language. As the party that set up any such impossible condition (SOF ¶ 12), DLT assumed the risk of that impossibility. *See ARINC Research Corp.*, ASBCA No. 15861, 72-2 BCA ¶ 9,721, at 45,408.

Finally, DLT cites *HFS, Inc.*, ASBCA No. 43750 et al., 92-3 BCA ¶ 25,198 (app. mot. at 45-46). However, *HFS* supports—instead of undermining—the conclusion the Certification Provision did not require the government to remove, and certify the removal of, the Quest software in this appeal. That is because *HFS* relied upon the fact that "the contract is clear that software remained the property of appellant and that the Government was given a license for certain purposes," *HFS, Inc.*, 92-3 BCA ¶ 25,198 at 125,562, while the Marine Corps acquired a perpetual license in this appeal. (SOF ¶ 16).

In sum, there is no genuine issue of material fact suggesting that the Marine Corps breached the Certification Provision.

III. *There Is No Genuine Issue of Material Fact Supporting DLT's Ratification Claim*

There is no genuine issue of material fact suggesting that the Marine Corps ratified the option year maintenance requirements. Under the institutional ratification doctrine, those with authority may ratify an agreement made by a government agent without authority. *Sinil Co., Ltd.*, ASBCA No. 55819, 09-2 BCA ¶ 34,213 at 169,132 (citing *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed. Cir. 1997)). Ratification by those with authority only can occur if: (1) the government accepts a benefit flowing from the unauthorized agreement, *In re Catel, Inc.*, ASBCA No. 54627, 05-1 BCA ¶ 32,966 at 163,299 (citing *Janowsky v. United States*, 133 F.3d 888, 891 (Fed. Cir. 1998)); and (2) the ratifying official has actual or constructive knowledge of the unauthorized action. *Sinil*, 09-2 BCA ¶ 55819 at 169,132 (citing *United States v. Beebe*, 180 U.S. 343, 354 (1901)).

Here, DLT argues that the Marine Corps benefited from having the Quest software on its system by keeping the capability of using the software in the future (app. mot. at 70). As an initial matter, the agreement that the Marine Corps purportedly ratified was the option year for the maintenance (*id.*); not an agreement to purchase the Quest software because the Marine Corps already had permanent licenses for the Quest software. The Marine Corps never benefited from any maintenance during the option years because it is undisputed that the Marine Corps never actually used the maintenance during the option years. (SOF ¶ 30).

Further, there is no genuine issue of material fact suggesting that the contracting officer had actual or constructive knowledge of any unauthorized action.

20

The contracting officer did not have actual or constructive knowledge of any maintenance after the base year because there was no such maintenance. (SOF ¶ 30). Indeed, the undisputed evidence shows that the Marine Corps was unaware that even the Quest software remained on its systems during the first option year, and promptly removed the Quest software once the Marine Corps learned that the software remained on its systems (SOF ¶ 30). Thus, there is no Genuine Issue of Material Fact suggesting that the contracting officer had constructive knowledge that the Marine Corps even had the Quest software on its systems, let alone that there was any maintenance of that software.

In support of its ratification argument, DLT cites *Force 3, LLC v. Dept. of Health and Human Serv.*, CBCA 6621, 2021 WL 1691457 (April 14, 2021) (app. mot. at 70-71). As an initial matter, as a decision of the Civilian Board of Contract Appeals, *Force 3* is not binding on us. In any event, it is distinguishable because— unlike in this case—the agency in *Force 3* continued to use the support services despite not exercising an option for those services, and the contracting officer knew of that continued use (*id.* at 71).

As a result, the Marine Corps is entitled to judgment as a matter of law on DLT's ratification claim.

IV.  *There Is a Genuine Issue of Material Fact as to Part—but not all—of DLT's Breach of the Duty of Good Faith and Fair Dealing Allegations*

There is a genuine issue of material fact as to part—but not all—of DLT's breach of the duty of good faith and fair dealing claim. Every contract imposes upon each party a covenant of good faith and fair dealing in its performance and enforcement. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). The covenant includes a duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. *Id.* at 991. The breach of the covenant of good faith and fair dealing may involve some variation on the "bait-and-switch," which is the type of breach DLT alleges here. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010); (app. mot. 77-81). "A bait and switch occurs when the government awards a significant contract benefit to a contractor, only to improperly eliminate that benefit soon thereafter." *Kelly-Ryan, Inc.*, ASBCA No. 57168, 18-1 BCA ¶ 36,944 at 180,030 (quoting *K2 Solutions, Inc.*, ASBCA No. 60907, 17-1 BCA ¶ 36,801 at 179,375-76); *see also Precision Pine*, 596 F.3d at 829. A breach of an implied covenant of good faith and fair dealing does not require a violation of an express provision of the contract. *Metcalf*, 742 F.3d at 994. However, a party cannot use an implied covenant of good faith and fair dealing to expand another party's contractual duties beyond those in the express contract, or to

21

create duties inconsistent with the contract's provisions. *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017).

Here, there is no genuine issue of material fact suggesting that the Marine Corps breached the duty of good faith and fair dealing by determining in the Limited Sources Justification and Approval that it needed additional licenses and maintenance, but there is a genuine issue of material fact as to whether the Marine Corps breached that duty by failing to disclose that it already had decided not to exercise the options prior to DLT completing its financing.[6]

A.  *There is No Genuine Issue of Material Fact Suggesting that the Marine Corps Breached the Duty of Good Faith and Fair Dealing by Determining Pre-Award That it Needed Additional Licenses and Maintenance*

There is no genuine issue of material fact suggesting that the Marine Corps breached the duty of good faith and fair dealing when it determined, pre-award, in its Limited Sources Justification and Approval that it needed additional licenses and maintenance (app. mot. at 79-80).  It is not reasonable to infer from the pre-award determination of need that the Marine Corps still would need maintenance for the option years, particularly because FAR 17.207 only permitted the contracting officer to exercise an option after a fresh determination of need, among other factors (SOF ¶ 14).

---

[6] In addition to the above theories, DLT raises a laundry-list of other purported baits-and-switches: namely when the Marine Corps (1) left Quest software on its systems in violation of the Certification Provision and agency policy; (2) replaced Quest software in violation of the Bona Fide Needs Provision; (3) reassigned the contracting officer who negotiated the Bona Fide Needs and Certification Provisions with a contracting officer who misunderstood whether those provisions were incorporated into the Contract; and (4) prevented a contracting officer from participating in the decision not to exercise the first option (app. mot. at 80).  However, merely throwing the label of a breach of the covenant of good faith and fair dealing on alleged breaches of contract provisions or internal agency decisions is insufficient to raise a genuine issue of material fact as to such a claim, particularly because, as discussed above, there was no violation of the contract provisions.

22

B.   *There Is a Genuine Issue of Material Fact as to Whether the Marine Corps Breached the Duty of Good Faith and Fair Dealing by Failing to Disclose that the Marine Corps Already Had Decided Not to Exercise the Option Prior to DLT Completing Its Financing*

There is a genuine issue of material fact as to whether the Marine Corps breached the duty of good faith and fair dealing by allowing DLT to rely upon the Marine Corps' representation that it intended to exercise the options if there was a bona fide need in order to obtain financing, and then failed to disclose that the Marine Corps already had decided not to exercise the option prior to DLT completing its financing.  First, a reasonable fact-finder, drawing all inferences against the non-moving party could find either way on the question of whether the contracting officer allowed DLT to rely upon the Marine Corps' representation that it intended to exercise the options if there was a bona fide need in order to obtain financing based upon:

(1)    The February 27, 2019 email from the contracting officer acknowledging in response to DLT proposing a variation of the bona fide need language that the way Quest required multi-year purchases had a significant impact upon DLT's risk (SOF ¶ 13);

(2)    The contracting officer's subsequently agreeing to the Bona Fide Needs Provision (SOF ¶¶ 14, 16);

(3)    The contracting officer's incorporation the Notice of Assignment and Instrument of Assignment into the contract through Modification No. P00001 (SOF ¶ 22);

(4)    The contracting officer's statement in the April 3, 2019 email that "[t]he only way that Quest would sell us the potential for four years of requirement was to have their reseller take a loan from a bank in order to pay Quest the full four-year sum.  The contractor has done that" (SOF ¶ 25); and

(5)    Ms. Toth's April 4, 2019 email to the contracting officer stating that, even developing a two-year road map would not help a contractor because it had to take a four-year loan (SOF ¶ 26).

Moreover, it is reasonable to infer that allowing DLT to rely upon the Marine Corps' representation that it intended to exercise the options if there was a bona fide need in order to obtain financing both did and did not constitute a "bait" by awarding DLT the significant contract benefit of allowing DLT to rely upon that representation.

23

Second, a reasonable fact-finder could or could not find that the contracting officer should have known—but failed to disclose—that the Marine Corps already had decided not to exercise the option prior to DLT completing its financing based upon:

(1)     The March 28, 2019 email from Mr. Pilcher the day before Modification No. P00001 indicating that the Marines Force System Cyberspace Operations Group did not need the Quest software (SOF ¶ 20);

(2)     The March 29, 2019 email from Ms. Ong the day of Modification No. P00001 indicating that the Marines Corps Systems Command would discontinue the Quest software (SOF ¶ 21);

(3)     The contracting officer's statement in the April 3, 2019 email that "now, not even a month after award, we are deciding that we don't need any options because we don't want to use those products?  The contractor and the bank understand that the options are optional, but this paints us as disingenuous in the worst way (SOF ¶ 25);" and

(4)     The contracting officer's testimony that:

> Q:     And if the day before you executed [modification P00001] on March 29, if someone in the Agency had emailed you the day before on March 28 and said, to summarize, we really do not require Quest licensing any longer for [GPO Admin], [Recovery Manger for Active Directory], and Change Auditor, what would you have done?
>
> A:     I would have tried to understand why, why did they have me construct the contract the way that they did, what is it that we are doing, why do we no longer require those things.
>
> Q:     And would you have then entered into [modification P00001] the following day with DLT?
>
> A:     I think that I probably would have had some conversations.
>
> Q:     Conversations with whom?
>
> A:     Both DLT and Key.

24

Q: And what actions do you think [DLT and/or Key] might have taken if they had known that the Agency did not intend to exercise the options?

. . . .

A: I have no idea. But your point, I think in the interest of good faith, I would have tried to figure out something that was equitable.

(SOF ¶ 22).

It is reasonable to infer that knowing and failing to disclose that the Marine Corps already had decided not to exercise the option prior to DLT completing its financing both did and did not constitute a "switch" by improperly eliminating the benefit of allowing DLT to rely upon the representation that the Marine Corps intended to exercise the option if there was a bona fide need in order to obtain financing soon after extending that benefit. Therefore, neither party is entitled to summary judgment on the claim that the Marine Corps breached of the covenant of good faith and fair dealing by failing to disclose that the Marine Corps already had decided not to exercise the option prior to DLT completing its financing.[7]

<u>CONCLUSION</u>

Because there is a genuine issue of material fact as to whether the Marine Corps breached the covenant of good faith and fair dealing by failing to disclose that the Marine Corps Systems Command already had decided not to exercise the option prior to DLT completing its financing, we deny both parties' cross-motions for summary judgment on that issue. However, because there are no genuine issues of material supporting DLT's breach of contract, ratification, and other breach of the duty of good faith and fair dealing allegations, we grant the government's motion for summary judgment—and deny DLT's motion for summary judgment relating to those issues. Accordingly, the breach of the bona fide needs portion of the complaint is stricken

---

[7] Of course, a fact-finder will have to determine after a hearing whether the contracting officer actually: (1) allowed DLT to rely upon the Marine Corps' representation that it intended to exercise the options if there was a bona fide need in order to obtain financing; and (2) should have known –but failed to disclose that the Marine Corps already had decided not to exercise the option prior to DLT completing its financing. Likewise, a fact-finder will have to determine after a hearing whether to actually infer that any such conduct constituted a bait and switch.

from Count I; however, the breach of the covenant of good faith and fair dealing remains. Count II is stricken in its entirety.

Dated: April 29, 2024

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63069, Appeal of DLT Solutions, LLC, rendered in conformance with the Board's Charter.

Dated: April 29, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals